[Crim. No. 2672. In Bank.—September 25, 1924.]

## THE PEOPLE, Respondent, v. JACK FERDINAND et al., Appellants.

[1] CRIMINAL LAW—MURDER — COMMISSION OF ROBBERIES—IDENTIFICATION—CONSPIRACY—EVIDENCE.—In a prosecution for murder committed in the perpetration of a robbery which was preceded by the robbery of the occupants of an automobile and also followed by another robbery, the robbery resulting in the murder and the third robbery having been witnessed by the victims of the first robbery, evidence regarding the commission of the third robbery which occurred after the crime of murder had been committed was admissible as showing that the persons who were with the victims of the first robbery were the persons who committed the murder, and as showing acts coming within the scope of a general conspiracy.

[2] ID.—CONSPIRACY TO ROB — MURDER—EVIDENCE.— In such prosecution, the fact that in carrying out the conspiracy to commit robbery a crime of greater magnitude was also committed does not affect the principle that acts of each of the conspirators which are performed during the life of the conspiracy, and which acts are within the scope and in furtherance of the conspiracy, are admissible in evidence.

[3] ID. — CROSS-EXAMINATION OF PROSECUTING WITNESS — LIMITATION BY COURT—ABSENCE OF PREJUDICIAL HARM.—In such prosecution, even conceding the possibility of error (which as a matter of law cannot be done), no prejudicial harm resulted to defendants' case through the refusal by the trial court to permit the cross-examina-

---

1. Admissibility of evidence of other offenses in criminal prosecution to prove identity of defendant, notes, 105 **Am. St. Rep.** 976; 3 **A. L. R.** 1540; 22 **A. L. R.** 1016; 27 **A. L. R.** 357; 62 **L. R. A.** 278. See, also, 8 **Cal. Jur.** 71; 8 **R. C. L.** 201.

2. See 5 **Cal. Jur.** 522; 8 **Cal. Jur.** 123; 5 **R. C. L.** 1089.

3. See 28 **R. C. L.** 599.

tion of the prosecuting witness to proceed along the lines indicated by a particular question.

[4] ID.—EVIDENCE—IMPEACHMENT.—In such prosecution, the defendants having sought to impeach a witness presented by the prosecution by calling her attention to certain testimony which she had given at the coroner's inquest over the body of the deceased, and which testimony was apparently inconsistent with statements which she had made on her direct examination, the prosecution had the right on redirect examination, and as explanatory of the statements made by her on cross-examination, to direct the attention of the witness to certain other testimony given by the witness at the inquest.

[5] ID. — EVIDENCE OF ROBBERY COMMITTED AFTER MURDER — CONSPIRACY.—In such prosecution, the admission of testimony relating to the robbery of the victims of the third robbery, together with the introduction in evidence of certain exhibits as part of the spoils of said robbery, was proper as being part and parcel of one general conspiracy.

[6] ID.—INTRODUCTION OF ARTICLES USED BY DEFENDANTS—CHARACTER OF EVIDENCE.—In such prosecution, although the connection between certain articles introduced in evidence and those used by the defendants on the night of the homicide was not absolutely demonstrated, the rule is that in such circumstances clear, certain, and positive proof is not required.

[7] ID.—EXPERIMENTS — EXPERT TESTIMONY — ADMISSIBILITY OF.—In such prosecution, assuming that expert testimony as to the distance that a certain caliber revolver could be held from an overcoat worn by the deceased at the time he was killed, and, upon such revolver being fired, would produce powder-marks such as appeared upon the garment in question, was material to the issues involved in the case, the rule is that where substantially similar conditions, as between the facts of the case and the experiment, are shown to exist, it is not error to admit such evidence.

[8] ID.—CONFESSION — EVIDENCE — PROVINCE OF TRIAL COURT.—Facts preliminary to the introduction of a statement involving a confession are in the first instance to be addressed to the court for its decision as to the admissibility of the confession.

[9] ID.—CONFESSION—PRELIMINARY EVIDENCE — RIGHT OF DEFENDANT. In such prosecution, in order that the question as to the ad-

4.  See 28 R. C. L. 653.

5.  See 5 Cal. Jur. 524; 8 Cal. Jur. 140; 5 R. C. L. 1088; 10 R. C. L. 991.

7.  See 8 Cal. Jur. 79, 81; 10 Cal. Jur. 861; 8 R. C. L. 181; 10 R. C. L. 1002.

9.  Right of accused to introduce evidence of voluntary character of confession before admission of confession in evidence, note, 15 Ann. Cas. 185. See, also, 8 Cal. Jur. 116; 1 R. C. L. 579.

missibility of the confession of one of the defendants might be determined by the trial court, it was proper that if requested by the defendants evidence be introduced for that purpose; and evidence in behalf of a defendant may be adduced on cross-examination of a witness introduced by the prosecution as well as by testimony given on direct examination of one of defendant's witnesses.

[10] ID.—CHARACTER OF CONFESSION—EVIDENCE—RIGHT OF DEFENDANT. In such prosecution, if it would have been proper for the confessor to have shown by his own testimony what cell he had occupied in the jail or "the relations concerning his confinement" as having a bearing upon the question of whether or not his confession was free and voluntary, and not made under the influence of force or violence, it would follow that such evidence was competent on the *voir dire* or on the cross-examination of a witness who testified regarding the confession.

[11] ID.—ADMISSION—CONFESSION—DEFINITIONS OF.—An admission as applied to criminal law is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt. On the other hand, a confession by a defendant leaves nothing to be determined, in that it is a declaration of his intentional participation in a criminal act, and must be a statement of such a nature that no other inference than the guilt of the defendant may be drawn therefrom.

[12] ID.—MENTAL AND PHYSICAL CONDITION OF DEFENDANT—COERCION —INADMISSIBILITY OF CONFESSION.—In such prosecution, if either the mental or physical condition of the defendant confessor at the time the confession was made, or immediately prior thereto, was such as to indicate that the confession was not free and voluntary, but, to the contrary, that it was induced by coercion of any sort, the confession was inadmissible.

[13] ID.—CONFESSION—VOLUNTARY CHARACTER OF—PRIMA FACIE CASE —QUESTIONS ASKED BY DEFENDANT—IMMATERIALITY OF.—In such prosecution, the evidence *prima facie* having shown that no conditions existed which would make the confession in question not free and voluntary, a question asked on the *voir dire* examination of a witness by the confessor's counsel, "What cell was he in?" to which an objection was sustained, was immaterial to the inquiry bearing upon the character of the confession, where it was not followed by specific inquiries tending directly to show a state of facts amounting to coercion, although the trial court informed

---

11. See 8 Cal. Jur. 106; 1 R. C. L. 550.

12. When confession is voluntary, notes, 18 L. R. A. (N. S.) 768; 50 L. R. A. (N. S.) 1077. See, also, 8 Cal. Jur. 109; 1 R. C. L. 562.

such counsel that he might "ask any questions you wish to of this witness, and I will rule on them as any question comes up."

[14] Id.—Circumstances Surrounding Confinement of Defendant— Exclusion of Evidence—Absence of Miscarriage of Justice.— In such prosecution, even assuming that the defendant confessor was entitled to testimony concerning the circumstances surrounding his confinement in the city jail prior to the confession, yet the evidence is so convincing that a murder was committed by the · defendants in the perpetration of the crime of robbery that it cannot be said that the action of the trial court in excluding such testimony worked a miscarriage of justice.

[15] Id.—Death Penalty — Instructions — Absence of Error.—In such prosecution, no prejudicial error resulted from the trial court's refusal to give an instruction requested by defendants which in substance would have told the jury that there was no presumption or intendment of the death penalty in a case where the jury found that the defendants were guilty of murder in the first degree, and that if a verdict of guilty of murder in the first degree should be returned by the jury both such a verdict and the determination of the penalty to be inflicted must be by unanimous agreement, where the subject of such proposed instruction was substantially covered by the court in other instructions given to the jury.

[16] Id. — Equal Guilt of Defendants — Instructions. — In such prosecution, if it be assumed that all the defendants were concerned in the original plan to commit a robbery, and that in the execution thereof one of them shot and killed a certain person, each of the others "would be equally guilty in the eyes of the law" as to the murder committed by the one who fired the shot.

[17] Id.—Note Written to Juror—Alleged Misconduct—Evidence. In such prosecution, a note written by the husband of one of the jurors having been handed to such juror after a verdict of guilty had been returned against one of the defendants, and before a verdict had been returned against either of the other two defendants, in the absence of even a remote probability that the note was either intended to or did in any way affect the verdict of the jury, it cannot be presumed that either the entire panel or the individual juror to whom the note was addressed was at all affected by its contents.

[18] Id.—Alleged Misconduct of Bailiff — Evidence — Absence of Error.—In such prosecution, where the only evidence supporting the claim that the bailiff made a statement to the jury to the effect that unless a verdict were agreed upon "the court would

15.   See 2 Cal. Jur. 1026; 2 R. C. L. 261.
16.   See 13 Cal. Jur. 600; 13 R. C. L. 724.
17.   See 16 R. C. L. 313.

keep them out until the balance of the week, or until they had arrived upon a verdict" was contained in an affidavit that the bailiff admitted that he had done so, and, on the other hand, the affidavits of the bailiff and a juror showed that while engaged in casual conversation, in reply to the remark of said juror, "I have heard that a jury must be discharged within seventy-two hours, if they do not agree upon a verdict," the bailiff said: "Well, I don't know—it depends upon the nature of the case and the length of time required to try it, and I don't think there is any arbitrary time within which a jury must be discharged," the affidavit of said juror showing further that she did not "communicate or discuss the said conversation or remark, or any part thereof, with any member of the said jury in the above matter," and the affidavit of each of the remaining jurors showing that he did not hear the remark in question, nor did he know prior to the discharge of the jury that the alleged remark had been made, considering the contents of all such affidavits no error resulted from the matter complained of.

---

(1) 16 C. J., p. 600, sec. 1165; 30 C. J., p. 203, sec. 433.    (2) 16 C. J., p. 669, sec. 1337.    (3) 17 C. J., p. 313, sec. 3658.    (4) 40 Cyc., p. 2521.    (5) 30 C. J., p. 203, sec. 433.    (6) 16 C. J., p. 618, sec. 1222.    (7) 16 C. J., p. 563, sec. 1094.    (8) 16 C. J., p. 735, sec. 1513.    (9) 16 C. J., p. 733, sec. 1510.    (10) 16 C. J., p. 734, sec. 1511.    (11) 1 C. J., p. 1363.    (12) 16 C. J., p. 717, sec. 1468.    (13) 16 C. J., p. 734, sec. 1511 (1926 Anno.).    (14) 17 C. J., p. 334, sec. 3679.    (15) 16 C. J., p. 1063, sec. 2506.    (16) 29 C. J., p. 1063, sec. 30.    (17) 16 C. J., p. 1081, sec. 2538.    (18) 16 C. J., p. 1081, sec. 2539.

APPEAL from judgments of the Superior Court of Los Angeles County and from order denying new trials.    Russ Avery, Judge.    Affirmed.

The facts are stated in the opinion of the court.

S. S. Hahn, Nathan Goldberg, Rose Phillips and Claude Morton for Appellants.

U. S. Webb, Attorney-General, H. H. Linney, and John W. Maltman, Deputy Attorney-Generals, for Respondent.

HOUSER, J., *pro tem.*—Jack Ferdinand, John Sears, and John Geregac were convicted of the crime of murder in the first degree and adjudged to suffer the penalty of death.

From such judgment and from an order denying their motion for a new trial they appeal to this court.

The evidence tends to show, in brief, that at about 12 o'clock at night a party consisting of four persons were seated in a stationary automobile which will hereafter be called automobile No. 1. At that time three persons, who were later identified as the defendants in this case, approached the automobile party, and, after robbing each of the persons seated in the automobile, the three defendants boarded the automobile and commanded the driver thereof to drive the automobile in a certain direction, with which order the driver complied. After traveling a short distance the automobile in which the defendants were riding was brought to a stop opposite a second automobile, which was standing near the curb of the street, which automobile hereafter will be called automobile No. 2, and in which were seated a man by the name of Chapman and a woman by the name of Boehmer. Defendants Ferdinand and Sears then left automobile No. 1, went to automobile No. 2, where they robbed each of the persons in automobile No. 2, and, in addition thereto, defendant Ferdinand shot and killed Chapman. Immediately thereafter defendants Ferdinand and Sears returned to automobile No. 1, upon which they resumed the positions occupied by each of them respectively, and again directed the driver thereof to drive the automobile in a given direction, and upon coming to a point opposite a third automobile parked near the curb of the street, automobile No. 1 was stopped and a third robbery was committed by the defendants as to the persons seated in automobile No. 3.

[1] The first alleged error to which attention is directed by counsel for appellants is, that at the trial of the action, over the objection of defendants, evidence was received regarding the third robbery, which it is claimed constituted "a distinct and substantive offense" and which had no bearing upon or connection with the charge for which the defendants were being tried—the specific point being that after Chapman, who had been seated in automobile No. 2, had been shot and killed by one of the defendants, that particular crime was ended; that whatever criminal act may have been perpetrated thereafter by the defendants or by any of them as to the occupants of automobile No. 3, consti-

tuted a separate offense and in no way related to the killing of Chapman; and that, as a consequence, no evidence touching the facts or circumstances surrounding the robbery of the persons robbed in automobile No. 3 should have been admitted by the court for any purpose.

Evidence relating to the third robbery was offered and received solely "on the theory of identification." It was, of course, necessary to identify the defendants as the persons who first robbed Chapman and Mrs. Boehmer and thereafter killed the former. The four occupants of automobile No. 1 who previously had been robbed by the defendants were present at and unwilling spectators of both the robbery and the murder of Chapman, and thereafter likewise and in a similar manner witnessed the robbery of the occupants of automobile No. 3. The testimony of the four persons comprising the party in automobile No. 1, that the defendants were the persons who robbed and killed Chapman, and that the defendants were the same persons who robbed the occupants of automobile No. 3, would be corroborated as to the latter part by the identification of the defendants by the victims of the third robbery. The substance of the point is that certain witnesses testified that the defendants committed the crime of murder, and immediately thereafter that certain other persons saw the said witnesses and the said defendants together. Supposing that none of the party in automobile No. 1 could identify either of the three defendants, surely, if shortly after the murder was committed certain persons saw the occupants of automobile No. 1 in company with the defendants in the immediate vicinity of the place where the crime was committed and could identify the defendants as the persons whom they had seen at that time and place, evidence of such fact or facts would have tended to prove at least opportunity on the part of the defendants to commit the offense, as well as to corroborate the testimony of the original occupants of automobile No. 1, that the persons who were with them were the persons who committed the murder. It would further appear that evidence as to the facts relating to the robbery of the occupants of automobile No. 3 was admissible in evidence on the ground that the acts of the defendants in consummating the third robbery were but a part of the general conspiracy, although the crime of murder was committed

during the time that the persons in automobile No. 2 were robbed. The crime of murder was but a grisly incident arising out of the conspiracy to rob not only the occupants of automobile No. 1 and automobile No. 2, but those of automobile No. 3 as well. [2] The fact that in carrying out the conspiracy to commit robbery a crime of greater magnitude was also committed does not affect the principle that acts of each of the conspirators which are performed during the life of the conspiracy, and which acts are within the scope and in furtherance of the conspiracy, are admissible in evidence. If no murder had been committed and the defendants had been tried on a charge of robbery affecting the victims of any one of the several robberies on the night in question, it could not be doubted that evidence as to the commission of either or both the other robberies would have been admissible.

[3] It is next contended by appellants that the court erred in limiting the defendants in their right to cross-examine the prosecuting witness. It is a most salutary rule which permits a wide latitude in cross-examination and one which is justly entitled to and which receives universal recognition. Its use and its purpose are so well known that to dilate thereon would add nothing to the superabundance of expressions relating thereto which are to be found in adjudications by the courts and in opinions by renowned text writers as well. While the particular question to which appellants have directed attention possibly might have been permitted, it is difficult to perceive its materiality or to understand how or in what manner any conceivable answer to the question, or any avenue which might have been opened thereby, would either seriously or at all have affected the result. It is much doubted that the purpose of the question was cross-examination; but even conceding the possibility of error (which as a matter of law we cannot do), no prejudicial harm resulted to defendants' case through the refusal by the court to permit the cross-examination to proceed along the lines indicated by the question.

[4] Appellants complain that the court erred in permitting the prosecution to impeach its own witness. An examination of the record discloses the facts connected with the incident to which reference is made by appellants to have been that one of the witnesses presented by the prose-

cution was sought to be impeached by the defendants by calling her attention to certain testimony which she had given at the coroner's inquest over the body of the deceased, and which testimony was apparently inconsistent with statements which she had made on her direct examination. On redirect examination, and as explanatory of the statements made by her on cross-examination, the prosecution directed the attention of the witness to certain other testimony given by the witness at the inquest. The rule is universal that such a right exists.

[5] Another alleged error consists in the admission of testimony relating to the robbery of the occupants of automobile No. 3, together with the introduction in evidence of certain exhibits as part of the spoils of the third robbery. As heretofore indicated, the robbery of the persons riding in automobile No. 3 was part and parcel of one general conspiracy, and evidence concerning that transaction was as admissible as was any other fact in the case.

Error is predicated upon the fact that the court admitted in evidence against the defendants "four guns, a flashlight and a suitcase." The evidence showed that at the time the murder was committed each of the defendants had a "gun," and, in addition thereto, that one of them had a flashlight. When the defendants were arrested one of them had concealed in the hatband of his hat a parcel check, which, on presentation at the check-room, called for the suitcase in question, which was later shown by the evidence to be the property of another of the defendants, and in which suitcase were found the enumerated articles with the exception of the flashlight, to the introduction of which objection was made. While none of the articles was positively identified by any witness as having been used by either of the defendants at the time the murder was committed, there was general testimony that three of the "guns" resembled those used by the defendants at that time, and the fourth "gun" was identified as being the property of the deceased. [6] Although the connection between the articles introduced in evidence and those used by the defendants on the night in question was not absolutely demonstrated, the rule is that in such circumstances clear, certain and positive proof is not required (16 Corpus Juris, 619).

In *People* v. *Wilkins,* 158 Cal. 530 [111 Pac. 612], which was a murder case, it was shown that the deceased met her death from strychnine poisoning, and a bottle containing strychnine found in her home was admitted in evidence. This court, in passing upon the matter, said: "Its identity and integrity were both sufficiently established to justify its admission in evidence."

In *People* v. *Szafcsur,* 161 Cal. 636 [119 Pac. 1083], it appeared that the defendant had killed his wife by three shots from a revolver; that thereafter he went from his home to a public park, where, by exploding a shell, he inflicted a scalp wound upon himself, and in this situation, with the pistol in his hand, was found by an officer, who took charge of the pistol and found it to be a five-chambered revolver, three of which chambers had been discharged and were empty, and of the remaining chambers, one contained an exploded and the other an unexploded shell. Defendant afterwards admitted that he killed his wife. It was held that there was *prima facie* evidence that the revolver taken from him was the one with which the killing was done, and in the absence of any counter-showing was properly admitted in evidence.

In the case of *People* v. *Mar Gin Suie,* 11 Cal. App. 42 [103 Pac. 951], which was also a murder case, it was held proper for the prosecution to prove all circumstances connected with the arrest of the defendant and to show by the arresting officer that he had found pistols in the room where the defendant was arrested, and to admit the pistols in evidence as exhibits, notwithstanding the fact that they were claimed by another person as his property. (See, also, *People* v. *Sullivan,* 129 Cal. 557 [62 Pac. 101]; *People* v. *Peete,* 54 Cal. App. 333 [202 Pac. 51].)

It is urged that the trial court erred in admitting in evidence certain expert testimony having to do with the distance that a .32-caliber revolver could be held from an overcoat worn by the deceased at the time he was killed, and, upon such revolver being fired, would produce powdermarks such as appeared upon the garment in question. The proper foundation was laid as to the kind of powder that was used, and the witness testified that he had made seven experiments at stated distances, averaging four shots to each experiment, on cloth similar to that of which the

overcoat was made, which cloth was stretched over a bag of sawdust, and which, in the opinion of the expert, constituting conditions similar to those testified to as having been present at the time the deceased met his death. [7] It is manifest that the average juror would ordinarily have little if any knowledge on the subject covered by the examination to which reference has been had, and assuming that the desired evidence was material to the issues involved in the case, the rule is that where substantially similar conditions, as between the facts of the case and the experiment, are shown to exist, it is not error to admit such evidence. (*People* v. *Clark,* 84 Cal. 573 [24 Pac. 313]; *People* v. *Woon Tuck Wo,* 120 Cal. 294 [52 Pac. 833]; *People* v. *Fitzgerald,* 138 Cal. 39 [70 Pac. 1014]; *People* v. *Levine,* 85 Cal. 39 [22 Pac. 969, 24 Pac. 631]; *People* v. *Solani,* 6 Cal. App. 103 [91 Pac. 654].)

It is also urged on the part of appellants that the trial court committed prejudicial error in refusing permission to counsel for defendants to inquire on *voir dire* examination of a witness regarding the circumstances surrounding the confinement in the city jail of one of the defendants immediately prior to his making a confession of guilt. Preceding the testimony as to the confession by such defendant, the witness had stated that no offer of reward nor hope of immunity was held out to the defendant to induce him to make the statement, nor were any threats or violence used against him for that purpose, but that such statement by the defendant was made freely and voluntarily. At this point counsel for defendants was granted leave to examine the witness on *voir dire,* and thereupon, in response to certain questions propounded to the witness, it developed that at the time the statement was made the defendant had been confined in the city jail for a period of about six weeks. Counsel for defendant then asked the question: "What cell was he in?" to which question an objection interposed by the prosecution was sustained by the court. Prior thereto, counsel for defendant made inquiry of the court as follows: "How can I show that there has been force or violence used, or any coercion, or anything of that sort, if I cannot go into where his confinement was and under what conditions he was confined?" To which question the court replied: "If this conversation occurred in

a peculiar or unusual place, that fact might be an im-
portant matter; but where he had been before being brought
into this, would be immaterial, I think, as I view it."
And after further colloquy the court said: "Ask any ques-
tions you wish to of this witness and I will rule on them
as any question comes up." After the objection had been
sustained, counsel for defendant inquired of the court as
follows: "I understand your Honor will not permit us to
go into any of his relations concerning his confinement on
the *voir dire*. The Court: That is correct, yes." There-
upon the witness related the conversation which took place
between himself, the defendant and another person, in the
course of which defendant stated in substance that the reason
for his predicament was that he was too good-natured and
too good-hearted; that if he had stayed away from the other
defendants and kept his job he would not have been "in
this trouble." He was then asked: "Jack, how did all this
occur?" The witness then testified as follows: "And then
he stated that in the first hold-up that there were two couples
in the machine and the next hold-up was where Chapman
was killed and Miss Boehmer was with her [him]; and he
says, 'I don't understand how Miss Boehmer identified me
when she was eight feet away from where Chapman was
killed and it was foggy.' He says, 'I don't see how that
could be; it don't look right to me, how she could identify
me'; and then Mrs. Heagy asked him, 'What about the
other machine in the hold-up?' and he said the next one was
where there was a Spanish girl and another man in the
machine; and I remarked, 'That was where Viola Miller
was in that machine, wasn't it?' and he said, 'Yes, I believe
it was,' or words to that effect. Then there was a con-
versation—Mrs. Heagy asked something in regards to a re-
volver, if Chapman had a revolver on him. Ferdinand [the
defendant making the confession] said that he had a re-
volver on him all right; and then Mrs. Heagy asked him
what he was going to do with regard to the trial. 'Well,'
he said, 'it don't look like there is any chance for me at
all'; he says, 'It looks like it is my neck,' or words to that
effect. He says, 'There don't seem to be any chance for me
whatever,' and she says to him, 'Well, don't you think if
you told the truth with regard to this, Jack, that it would
help you?' and he says, 'I have not decided what I will do

yet,' he says; 'but,' he says, 'I think I will make a fight of the case.' Then Ferdinand asked a question, if capital punishment would be given to all the men in a crime like that, or just the one that actually fired the shot. I told him I was not sure about that and then we went into the conversation leading up to Lieutenant Becker being electrocuted in New York for the killing of Rosenthal.''

[8] That the facts preliminary to the introduction of a statement involving a confession are in the first instance to be addressed to the court for its decision as to the admissibility of the confession is indicated by the provisions of section 2102 of the Code of Civil Procedure and by adjudicated cases by the supreme court and appellate courts of this state. (*People* v. *Soto,* 49 Cal. 67; *People* v. *Columbus,* 49 Cal. App. 761 [194 Pac. 288], and cases there cited; *People* v. *Gibson,* 28 Cal. App. 334 [152 Pac. 316].) [9] In order that the question as to the admissibility of the confession might be determined by the court, it was proper that if requested by the defendants evidence be introduced for that purpose. Evidence in behalf of a defendant may be adduced on cross-examination of a witness introduced by the prosecution as well as by testimony given on direct examination of one of defendant's witnesses. [10] If it would have been proper for the defendant to have shown by his own testimony what cell he had occupied in the jail or "the relations concerning his confinement" as having a bearing upon the question of whether or not his confession was free and voluntary, and not made under the influence of force or violence, it would follow that such evidence was competent on the *voir dire* or on the cross-examination of a witness who testified regarding the confession. It is suggested by counsel for appellant that if it may be assumed that the defendant was in solitary confinement for about six weeks in a place where it was not usual to detain a prisoner charged with a crime, with no light or proper circulation of air entering his cell, without regular feeding, detained under a fictitious name selected by the police officers and known to them only for the purpose of preventing any friends from visiting the defendant; that at various intervals different officers attempted to wring from the defendant a confession; that the defendant refused to make a confession; that the officer promised the defendant that

he would permit him to visit a woman friend provided he made a statement, and provided, further, that the officer remained in the presence of the defendant and the woman visitor; that when the defendant was taken from his cell he was practically blind and unable to observe objects by reason of his long and dark confinement; that the tongue in his mouth was swollen and clove to the roof of his mouth; that under these conditions the defendant was permitted to talk to his woman friend, and that during such conversation he made a statement—it could not be said that under the assumed state of circumstances such statement was free and voluntary, not induced by coercion, duress, or hope of reward. But this court may lawfully act only on the record as presented, and cannot assume that all or any of the conditions or circumstances suggested by counsel for appellants had any existence in fact. Nor do appellants make any such claim. At most it is but the bare suggestion of a possibility, entirely unwarranted either from an inspection of the transcript of the proceedings had on the trial of the action, or from any inference which reasonably might be drawn therefrom.

A question has been raised as to the nature of the statement made by the defendant as affecting the necessity of showing its voluntary character and its freedom from any taint superinduced by threats made against, or violence to the person of, the defendant. It is urged that while as to *confessions* the rule is undoubtedly that no suggestion of undue influence in their production may properly exist, as to *admissions* the rule does not apply; and hence that, in the instant case, neither the question to which reference has been made, and which was directly propounded on the *voir dire* examination, nor any of the questions which might have been put either to the witness then on the stand or to any other witness for the purpose of showing defendant's "relations concerning his confinement," were at all material to the particular issue involved. **[11]** An admission as applied to criminal law is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt. On the other hand, a confession by a defendant leaves nothing to be determined, in that it is a declaration

of his intentional participation in a criminal act, and must be a statement of such a nature that no other inference than the guilt of the defendant may be drawn therefrom. (*People* v. *Strong,* 30 Cal. 151; *People* v. *Parton,* 49 Cal. 632; *People* v. *Velarde,* 59 Cal. 457; *People* v. *Miller,* 122 Cal. 84 [54 Pac. 523].) As stated in *Michaels* v. *People,* 208 Ill. 603 [70 N. E. 747], citing 8 Cyc. 562; 1 Greenleaf on Evidence, sec. 170; *Johnson* v. *People,* 197 Ill. 48 [64 N. E. 286] : "A confession is a voluntary acknowledgment of a person charged with the commission of a crime that he is guilty of the offense. It is a voluntary declaration by a person charged with a crime of his agency or participation in the crime. It is not equivalent to statements, declarations, or admissions of facts criminating in their nature or tending to prove guilt. It is limited in its meaning to the criminal act, and is an acknowledgment or admission of participation in it." And see, also, *Riley* v. *State,* 1 Ga. App. 651 [57 S. E. 1031]; *Burnett* v. *State,* 86 Neb. 11 [124 N. W. 927]; *Ransom* v. *State,* 2 Ga. App. 826 [59 S. E. 101]; *Shelton* v. *State,* 144 Ala. 106 [42 South. 30]; *State* v. *Campbell,* 73 Kan. 688 [9 Ann. Cas. 1203, 9 L. R. A. (N. S.) 533, 85 Pac. 784]; *State* v. *Royce,* 38 Wash. 111 [80 Pac. 268].

Without so deciding, it may be conceded for present purposes that the statement made by defendant Ferdinand amounted to a confession, rather than a simple admission of some material fact or facts, and consequently that the burden rested upon the prosecution to show that it was made freely and voluntarily, without hope of reward or immunity from punishment, and that it was not brought about by reason of threats or violence made against the said defendant. (*People* v. *Castro,* 125 Cal. 521 [58 Pac. 133].) **[12]** If either the mental or physical condition of the defendant at the time the confession was made, or immediately prior thereto, was such as to indicate that the confession was not free and voluntary, but, to the contrary, that it was induced by coercion of any sort, the confession was inadmissible. **[13]** In the case at bar the evidence *prima facie* showed that no such conditions existed. The purpose of the *voir dire* examination could have been none other than to show that the defendant's confession was not free and voluntary because made under circumstances and conditions which sub-

stantially amounted to coercion. The first question asked by defendant's counsel, and to which an objection was sustained, namely: "What cell was he in?" was immaterial to the inquiry unless followed by specific inquiries tending directly to show a state of facts amounting to coercion. But of such intention defendant's counsel gave no hint in his colloquy with the court, either prior to or immediately after the objection was sustained, sufficient to indicate what the scope of his inquiry would have been had he been permitted to pursue it. Counsel had already been informed by the court that he might "ask any questions you wish to of this witness, and I will rule on them as any question comes up." In view of this attitude of the court it was clearly the duty of defendant's counsel to indicate what the precise scope of his *voir dire* examination was to be, and what he proposed to show thereby. Counsel for appellants do not say that they expected to develop any fact or facts from which it would follow that coercion was used upon the defendant making the confession, or that the confession was not freely and voluntarily made, nor, judging from an examination of the record, is there the slightest reason for believing that any such facts actually existed. No offer of proof from any source followed the ruling by the court sustaining the objection to the question, and it must be assumed that had counsel for defendant been in possession of any fact tending to show coercion, a tender of such evidence would have been made in defendant's behalf. [14] But in any event, even assuming that the defendant was entitled to the testimony, yet the evidence is so convincing that a murder was committed by the defendants in the perpetration of the crime of robbery that it cannot be said that the action of the court in the premises worked a miscarriage of justice.

[15] Appellants complain that the court refused to instruct the jury at the defendants' request in substance that there was no presumption or intendment of the death penalty in a case where the jury found that the defendants were guilty of murder in the first degree; furthermore, that if a verdict of guilty of murder in the first degree should be returned by the jury both such a verdict and the determination of the penalty to be inflicted must be by unanimous agreement.

While it is true that the precise instruction to which counsel has directed attention was not given, it also appears that at defendants' request the court instructed the jury as follows:

"You are further instructed that in the event you should find defendants guilty of murder in the first degree it is then your duty to fix the penalty that they shall be required to suffer. In fixing this penalty, the jurors must bear in mind that each of them has his or her right to his or her individual opinion upon what penalty should be imposed in such a case and he or she should not permit any verdict to be returned as the verdict of the jury until the penalty has been unanimously agreed upon."

In addition thereto the jury was told that if it returned a verdict in substance that the defendants were guilty of murder in the first degree and made no recommendation as to the penalty, under the law the court must sentence the defendant to be hanged. It therefore is apparent that the subject to which appellants have referred was substantially covered by the court in other instructions given to the jury and, consequently, that no prejudicial error resulted from the refusal of the court to give the instruction which defendants requested in that connection.

Appellants also specify error in that the court instructed the jury that: "If the jury are satisfied to a moral certainty and beyond a reasonable doubt that the defendants, at or about the time charged in the indictment, were in the perpetration or attempt to perpetrate robbery, each and all of them would be principals therein and equally guilty in the eyes of the law of any act committed by any one of the defendants in and about such felonious scheme." The criticism of counsel is particularly directed to the use of the word "equally," referring to the degree of guilt of the several defendants. It will be noted that the language of the instruction is "equally guilty in the eyes of the law." By section 971 of the Penal Code it is provided, among other things, that "all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . shall be prosecuted, tried and punished as principals." **[16]** It would, therefore, follow that if it be assumed that all the defendants were concerned in the original plan to commit a

robbery, and that in the execution thereof one of them shot and killed Chapman, each of the others "would be equally guilty in the eyes of the law" as to the murder committed by the one who fired the shot.

[17] Charges of prejudicial misconduct on the part of one of the jurors who returned the verdict, as well as additional misconduct on the part of the bailiff sworn to take charge of the jury, are presented by appellants. From the record it appears that after the verdict of guilty had been returned against one of the defendants, and before a verdict had been returned against either of the other two defendants, the bailiff in charge of the jury handed to Mrs. Ringer, who was a member of the jury, a note which had been written to her by her husband, which read as follows:

"Dearest

"Lena Ed & I insist you have a private room from now on & Bailey says you *should*. Son is at Hawleys for the night after going to Criterion today & is *perfectly well*. Margaret & Harry gone to Carolines & everything fine. Worked till 11:30 last night & going to Moneta at 7:30 tomorrow both hope to return by 3 p. m. at least. Got 40.00 from Ingleside & expect same from Moneta & both are tickled pink.

"Not a thing in the world to worry about dear & I'm truthful.

"Love & Kisses,
"DADDY."

It is suggested by counsel for appellants that the note was a cipher message conveying to Mrs. Ringer the instruction from her husband that she vote to find both of the remaining defendants guilty. The affidavit of Mrs. Ringer with reference to the matter is to the effect that the note related only to personal matters; that she was wholly uninfluenced by anything contained in the note, and that prior to the receipt of the note she had formed her opinion that both the remaining defendants were guilty of murder in the first degree, without any extenuating circumstances.

While it is possible to imagine that the note conveyed some hidden meaning to its recipient, the language used therein is so plainly applicable to personal matters in the family of the juror that only by the greatest conjecture can it be conceived that it related in any manner to the case on

trial, or to the verdict to be returned therein. In the absence of even a remote probability that the note was either intended to or did in any way affect the verdict of the jury, it cannot be presumed that either the entire panel or the individual juror to whom the note was addressed was at all affected by its contents.

[18] Further complaint is made that during the time that the jury was deliberating upon its verdict one of the bailiffs of the court coerced the jury into bringing in a verdict by stating to the jury that unless a verdict were agreed upon ''the court would keep them out until the balance of the week, or until they had arrived upon a verdict.'' The only evidence supporting the claim that the bailiff made such a statement to the jury is an affidavit that the bailiff admitted that he had done so. On the other hand, the affidavit of the bailiff regarding the matter is that during a casual conversation which occurred at the breakfast table in a hotel where the jury was being cared for during its deliberation on the case, one of the jurors remarked to the bailiff, ''I have heard that a jury must be discharged within seventy-two hours, if they do not agree upon a verdict''; to which the bailiff replied: ''Well, I don't know—it depends upon the nature of the case and the length of time required to try it, and I don't think there is any arbitrary time within which a jury must be discharged,'' and nothing more. The affidavit of the bailiff contained the further statement ''that the said conversation was not directed at the cause on trial or at the time within which the jury sworn to try the above-entitled action might be discharged, or concerning the trial of any particular case then on trial in the courts of Los Angeles County, but was made solely in a casual conversation as indicated above.'' The juror with whom the conversation occurred made an affidavit to like effect; and, in addition thereto, made an affidavit that she did not ''communicate or discuss the said conversation or remark, or any part thereof, with any member of the said jury in the above matter.''

Each of the remaining members of the jury made affidavit to the fact that he did not hear the remark to which reference has been had, nor did he know prior to the discharge of the jury in the case that the alleged remark had been made. Considering the contents of all the affidavits

bearing upon the matter, it would seem clear that no error was committed in connection therewith.

The defendants were accorded a fair and impartial trial. None of their substantial rights was invaded or infringed upon by or through any act or thing of which complaint has been made. The verdict of the jury was reached after a most thorough and painstaking investigation had been had of the facts and circumstances surrounding the crime. The careful and deliberate judgment of the jury was that each of the defendants was guilty of the crime of murder in the first degree; and with full knowledge of its responsibilities and of resultant consequences, the jury failed to make any recommendation as to the punishment to be inflicted upon the defendants or any of them.

Judged by the statutes, as well as by the interpretations thereof, as announced in prior decisions of this court, no error was committed on the trial of the defendants which would justify an order of reversal herein. It is ordered that the judgment and the order denying the motion for new trial as to each of the defendants be and the same are affirmed.

Myers, C. J., Lawlor, J., Lennon, J., Waste, J., Richards, J., and Seawell, J., concurred.

Rehearing denied.