[Crim. No. 3784. Third Dist. Feb. 15, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. LOLA LOR-
RAINE BROSS et al., Defendants and Appellants.

Carr & Kennedy, Laurence W. Carr and Thomas J. McGlynn for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Raymond Momboisse and John Giordano, Deputy Attorneys General, for Plaintiff and Respondent.

WARNE, J. pro tem.*—Defendant Lola Lorraine Bross and her husband, Darrell Dean Bross, were convicted of the crime of voluntary manslaughter. Separate judgments were pronounced and entered against each defendant. Both have appealed from the judgments.

The case arises out of an altercation between Charles Kreiss, Darrell Dean Bross, hereafter referred to as Darrell, and Lola Lorraine Bross, hereafter referred to as Lola, arising out of a dispute over the use of a roadway by Darrell and Lola to get to their home in the area of Trinity County known as Carrier Gulch. The deceased, Charles Kreiss, lived below the Brosses who had to drive past the Kreiss home to get to their home. The Brosses moved into the area in October 1963 and at that time the road contained many chuckholes. There was also a ditch across the road opposite the premises occupied by Kreiss and his wife, Eva. The Brosses, as they had been informed they were required to do, began to fill in the chuckholes and help maintain the road. They filled the ditch and this irritated Kreiss, and he thereafter reopened it. The Brosses filled the ditch a second time, and Kreiss' wife, Eva, told her husband to shoot their tires. In November the road was barricaded for a short time. Darrell sought legal advice and was informed that his best remedy would be legal action to prevent interference with the Brosses' use of the road. An attempt was made by Darrell and his attorney to work out some type of an agreement that would provide there would be a right to pass by the Brosses that would not be interfered with — "a typical right of way agreement" — but Kreiss ignored the offer. Nor did he respond to an offer to arbitrate the matter. The Brosses were also subjected to petty harassments, such as roofing tacks or nails being placed in the road and prowlers knocking on their cabin. Darrell had a notice published in the Trinity Journal on January 25, 1964, which read: "Notice to my neighbor in Carrier Gulch. Petty harassment will be met with rifles. . . ."

In January of 1964 Charles Kreiss saw Darrell in the Hayfork Hotel, walked up to him and backhanded him, or

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

"belted" him one on the chin, without warning or provocation. Following this incident Darrell went to the law enforcement officers, including the district attorney, and sought a complaint against Kreiss but they did nothing about it. Thereafter an ineffective attempt was made to have the grand jury investigate the matter.

On March 18, 1964, Lola had a flat tire caused by a roofing nail, this being but one of a series. Darrell again complained to the law enforcement officers—specifically to Deputy Sheriff Barnhouse. Later that day, about 2 p.m., Darrell loaded his truck with gravel and drove to the vicinity of the Kreiss home. He had a .45 caliber Colt pistol with him. Lola followed in their automobile and parked it up by the "forks." After parking, Darrell loaded a shotgun for Lola and told her that he thought she should go up and stand by the mill and if Charlie came out with a rifle and pointed it at him, she should shoot—she should shoot at him not to kill but to stop him. Darrell then drove up the road, stopped his truck and started to fill the ditch in the road. Eva Kreiss saw him and told Charlie who went out of the cabin without his rifle. Kreiss told Darrell to take the gravel further up the road. Eva Kreiss testified Darrell then started shooting and Charles Kreiss went back into the house, got his rifle and went out again. Darrell fired five or six times. Eva Kreiss heard a shot from another gun, and following that shot Charles went back into the house and said, "Mama, they shot me." There was expert opinion evidence that Kreiss' rifle had not been fired. There was also evidence given by a witness who was visiting with the Kreisses at the time that he thought Kreiss fired his rifle twice.

Kreiss was driven by automobile to the Trinity General Hospital in Weaverville where surgery was performed. Kreiss died within approximately 24 hours following surgery. The testimony justified a conclusion that the surgery was probably incompetently performed. The cause of death was gunshot wounds of the abdomen that perforated the intestines. Only three had been sutured, though there were 10 perforations.

After the shooting Darrell was arrested by a deputy sheriff and taken to a substation where he was questioned. There is nothing in the record to show whether he was advised of his right to counsel or his absolute right to remain silent at that time. Later he was taken to the county jail and about 9 p.m. booked. The booking entry was as follows: "Charge: 217 P.

C.'' Sheriff Kelly admitted that he wrote in the word ''Investigation'' over the booking entry after Darrell had made his statement. The statement was taken in the sheriff's office commencing at 9:20 p.m. and ending at 9:50 p.m. Sheriff Kelly first asked Darrell to state his full name, his address, box number and age. He then stated to Darrell: ''I would like to inform you at this time, Mr. Bross, that you do have the right to be represented by counsel before you make any statements to us concerning this matter. Is it your wish that you be represented by Counsel? Answer: What is the charge placed against me, if any? Question: The charge at this time is Investigation of 217 P. C. Answer: That's better. Question: Fine. Answer: Yeah. *If that's what is likely to be the charge I would rather not answer any questions until I am represented by counsel.* Question: Would you be interested in giving us a statement of what took place over there today in your own words? Answer: Just a brief of what happened today? Question: Yes. Answer: Yeah, I think I can do that. Question: Well, just go ahead, then, in your own words.'' (Italics added.)

Darrell stated that about 10 o'clock in the morning Lola had a flat tire on the road and he went down to change it, pulling a roofing nail out of one of the tires. He then informed Sergeant Barnhouse, a deputy sheriff, of this and told him that so far as the situation up there on the road was concerned he had had it, and that he was now going to exert pressure. He felt up to this time he had done nothing about it. He also informed Barnhouse that whatever he did would be legal.

Later in the afternoon Darrell loaded the back of the pickup truck with gravel and went up on the road. His intention at that time was to fill in the ditch, which he proceeded to do. He stated he was in the habit of carrying guns of some sort in the car because of the threats that had been made against him and because of the fact that he had been assaulted by Kreiss. When he went up there, he had his wife stationed on a hill overlooking where he was going to fill in the ditch; she had a 12-gauge loaded shotgun, and he gave her instructions to the effect that if Charlie came out with a gun and pointed at him she was to shoot at Charlie, not to kill but to stop him, ''because I knew he was going to—or, I had a good idea. That's what I had her up there for.''

At that point Darrell was interrupted by Sheriff Kelly and asked the following question: ''Is this the shotgun that your wife had? (Showing the firearm to Bross.) Answer: Yes.

Question: This shotgun is a Stevens Model 311, 12-gauge shotgun. Fine. Go ahead, Mr. Bross, with your story."

Continuing, Darrell stated he drove up the road and proceeded to start shoveling dirt into the ditch. He had gotten about half a dozen shovelsful into the ditch when Kreiss came out the back door and stated: "You take that dirt out of there." Kreiss then started cursing at him and said, "Well, I'll fix you." Darrell nodded to his wife and kept right on shoveling. Kreiss came out of the front door with a rifle in his hands, raised it to his shoulder and pointed it at Darrell. Darrell grabbed his revolver, which was on the floor of the truck, and fired one shot into the air with the intention of showing Kreiss he had a loaded pistol and he "wasn't fooling around either." Darrell then stated that Kreiss fired a shot at him from the rifle. Darrell fired a second shot and then a third shot. He stated the second shot hit the bank and he did not intend to shoot at Kreiss with that shot. Kreiss started to run back to the house, at which time he, Darrell, fired another shot that struck the roof. Darrell further stated that after he fired the shot which struck the roof Kreiss evidently ran through the house, came out from the porch and very definitely fired another shot at him; and it was then that "I must—must have hit him because . . . I saw where he was and I threw a shot down there but I didn't see it hit. In other words, I was down behind the truck already and I ducked as fast as I could. . . ."

Darrell had noticed earlier that his wife had taken off after the shooting started. As he walked down the road Kreiss and his wife came driving by. Mrs. Kreiss was driving and Charlie Kreiss was slumped over in the front seat. As they passed Darrell ducked behind a tree. While he was waiting there his wife came and told him she had phoned the sheriff's office and Barney (Barnhouse) was on his way, so they waited. While waiting, Bud Jackson came along and told them Barney was in Weaverville and advised Darrell to start driving over that way. Barney met him on the Wildwood road and took him into custody and also took possession of the revolver and the shotgun.

The above is the pertinent portion of Darrell's statement in condensed form. His statement in the record is 22 pages in length—15 of which are by question and answer, notwithstanding his statement to the sheriff that he "would rather not answer any questions in the absence of counsel."

Immediately following Darrell's statement, Lola was taken

into custody, booked and her statement was taken. She was told that she was being held for investigation under section 217 of the Penal Code (assault with intent). Sheriff Kelly testified that ''not before but during the taking'' of her statement she was informed of her right to be represented by counsel before she made any statement. She was not expressly told that she had a constitutional right to remain silent.

She stated: ''. . . I guess about a—must have been a quarter of a mile down and I walked up and, as I was approaching, my husband had already been there and stopped the truck and he was in the back and I heard them talking back and forth. They were swearing and Charlie was swearing and he said—threatened my husband. He said, 'Get out of there if you—' Well, 'S.O.B.' and then he said, 'If you don't, I'll go in and get the gun and shoot you.'

''And, he went in and my husband standing—he didn't have a gun in his hand. He thought that this was nothing but a big bluff because Charlie—because I don't—I don't know whether he's all there upstairs or what, but he's not mentally stable, but he went inside and this is when I—I—I was up there at the time. I was standing up above (indicating) and he came out of the door with the gun in his hand and stood there, pointed at my husband.

''He had it in his—and I couldn't believe it. I was—I was rather shocked. I couldn't believe that this man would go that far, would do something I don't think is right for him to do.

''And, my husband continued filling in the ditch and I—I don't know whether he shot first or whether my husband shot first but my husband saw him with the gun and I stood there looking down and I couldn't believe that he was pointing the gun at my husband. It kind of frightened me inside. I just couldn't see this.

''So, my husband jumped down and, I don't know, I can't say actually whether he shot first, but anyway, it started going back and forth and I shot down to the ground and they say that they got some pellets out of Charlie, I guess perhaps that glanced off. That's why I'm here.''

Lola in her testimony also insisted she shot into the ground and did not intend to kill anyone; that she shot between them and the shot hit the dirt.

Obviously, as soon as Darrell's statement was completed suspicion began to focus on Lola and she was immediately taken into custody. The interrogation was designed to elicit

incriminating statements from her. And while Lola's statement was not a confession, nevertheless, once she admitted firing the shotgun she impliedly admitted firing the fatal shot.

". . . 'A confession is a voluntary statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary.' (*People* v. *Speaks*, 156 Cal.App.2d 25, 34 [319 P.2d 709]; *People* v. *Ferdinand*, 194 Cal. 555, 568-569 [229 P. 341].) As said in *Ferdinand*, a confession 'leaves nothing to be determined, in that it is a declaration of his [defendant's] intentional participation in a criminal act. . . .' (Pp. 568-569; . . .)'' (*People* v. *Swayze* (1963) 220 Cal.App.2d 476, 492 [34 Cal.Rptr. 5].) A confession is not " 'equivalent to statements, declarations or admissions of facts criminating in their nature or tending to prove guilt. It is limited in its meaning to the criminal act, and is an acknowledgment or admission of participation in it.' " (*People* v. *Ferdinand, supra*, at p. 569.) ▮ When the statement is such that it contains only facts from which guilt may be inferred it is admission rather than confession. (*People* v. *Elder*, 55 Cal.App. 644, 647 [204 P. 29]; *People* v. *Luzovich*, 127 Cal.App. 465, 469 [16 P.2d 144].)

▮ Lola's statement is within the strict definition of the word "admission," though it was as effective as any confession could be as an admission of guilt. It should be noted, however, that Wigmore defines a confession as an acknowledgment in express words by the accused in a criminal case of the truth of the guilty fact charged or of some essential part of it. (3 Wigmore, Evidence (3d ed. 1940) § 821, p. 238.)

Both Darrell's statement and Lola's statement were introduced into evidence and read to the jury over the objection of the appellants.

Appellants contend that they were not effectively advised of their constitutional absolute right to remain silent before their statements were taken and therefore the introduction of their statements into evidence was prejudicial error. They rely upon the decision in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], followed by *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. In *Dorado* the court held (at pp. 353-354) a "defendant's confession could not properly be introduced into evidence

because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogation that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel *or* of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (Italics added.) Concerning the fourth circumstance, *Dorado* at page 348 states: "If . . . the officers inform the accused of his right to counsel, he may waive it, and in such event his confession may be introduced into evidence. *Escobedo* also holds that the accused has the right to remain silent and that he must likewise waive that right if his self-incriminatory statements are to be admitted against him."

In *People* v. *Stockman* (1965) 63 Cal.2d 494, the court said at page 500 [47 Cal.Rptr. 365, 407 P.2d 277]: "There is evidence that, before any statements were taken, each appellant was warned by the police of his right to remain silent. None, however, was told of his right to counsel. This presents the problem whether a warning of the right to remain silent satisfies *Escobedo* and *Dorado,* or whether the police must also advise the accused of his right to counsel. Both warnings, and particularly the latter, must be given. This is indicated by what was said in the *Escobedo* case. That opinion was written in terms of right to counsel as well as the privilege against self-incrimination. . . ."

In the present case the sheriff's statement may have been adequate to convey to Darrell the impression that he was entitled to an attorney and entitled to remain silent. Although Darrell indicated that "he would rather not answer any questions," the sheriff proceeded to induce a statement from him, creating the notion that such a statement or "brief" would somehow be different than a question-and-answer process. Lulled into acceptance of this notion, Darrell then proceeded to do exactly what he had just been unwilling to do—give a complete version of the affair and his participation in it. Notwithstanding Darrell's apparent confusion, it is obvious that a voluntary narrative may produce as much self-incrimination as responses to interrogation. Darrell did not voluntarily and intelligently waive his rights to counsel and to silence. Hence his extrajudicial statement was inadmissible.

On the assumption that Lola too received adequate advice

as to her rights, this advice was not given before her statement but at sometime during the statement. ■ It is impossible on the present record to ascertain whether, if ever, there was any waiver on Lola's part; or how much, if any, of Lola's statement was given as the product of a conscious waiver. ■ The burden of showing adequate warning and waiver is on the prosecution. (*People* v. *Lilliock*, 62 Cal.2d 618, 621-622 [43 Cal.Rptr. 699, 401 P.2d 4].) ■ Waiver cannot be presumed from a silent record. (*People* v. *Schader*, 62 Cal.2d 716, 727 [44 Cal.Rptr. 193, 401 P.2d 665].)

■ It follows that Lola's statement was inadmissible.

■ Appellants also contend that the court committed prejudicial error by not instructing the jury on self-defense. They requested the following instructions on self-defense which were refused:

### *"Defendants' Proposed Instruction No. 51*

"A homicide committed by one in resisting or repelling an assault or battery, committed or attempted to be committed upon his person by another, is justified when there appears to such person as a reasonable man a threatened danger, which is immediate and sufficient to excite the fears of a reasonable person if he were in like position, that he is in danger of being killed or receiving great bodily harm at the hands of the assailant, and when the slayer acts under the influence of such fears and not in a spirit of revenge, and providing that the degree of resistance is not clearly disproportionate to the nature of the injury threatened or inflicted, and that the force used in repelling or resisting the assault or battery is not clearly greater than is apparently necessary.''

### *"Defendants' Proposed Instruction No. 54*

"It is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.''

The court, however, did give the following instructions offered by appellants pertaining to justifiable homicide:

"Homicide is justifiable and not unlawful when committed by any person in the lawful defense of the husband of such

person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished; *but the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.* (Italics added.)

"A bare fear of the commission of any of the offenses mentioned in this instruction, to prevent which homicide may lawfully be committed, is not sufficient to justify it. The circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

"The reasonable ground of apprehension mentioned in this rule just stated does not require actual danger, but it does require that the person about to slay another be confronted by the appearance of a peril such as I have mentioned; that such appearance arouse in her mind an honest conviction and fear of the existence of such peril; that a reasonable man in the same situation, seeing and knowing the same facts, would have, and would be justified in having, the same fear; and that the killing be done under the influence of such fears alone." (Defendants' instruction number 44.)

"Where the jury has a reasonable doubt whether the homicide was justifiable or excusable they must give the defendants the benefit of that doubt and acquit them." (Defendants' instruction number 46.)

Appellants further contend that the last cited instructions were misleading even though appellants proposed them. They contend that the emphasized portion of the instructions should have been excluded.

We are of the opinion that there is no evidence in the record to justify the giving of appellants' proposed instructions numbers 51 and 54 since the shot which injured Kreiss came from the shotgun fired by Lola and not the weapon fired by Darrell. Thus, there was no reason to give such instructions. Further during the trial the appellants did not contend that they were acting in self-defense. In their brief they state, "It was the position of the defendants in the case that the bullet wounds themselves were not fatal and that the death actually resulted from grossly negligent surgery." The defense of Lola was excusable homicide, involving accident and misfortune.

"... It is error to give an instruction which cor-

rectly states a principle of law which has no application to the facts of the case." (*People* v. *Sanchez*, 30 Cal.2d 560, 572 [184 P.2d 673], citing *People* v. *Roe*, 189 Cal. 548 [209 P. 560] ; *People* v. *Silver*, 16 Cal.2d 714, 722 [108 P.2d 4].)

Concerning appellants' instruction number 44, the error of which the appellants' complain could have been rectified by redrafting the instruction to include the exceptions appellants desired. ■ A defendant may not complain of an erroneous instruction given at his request. (Witkin, Cal. Criminal Procedure (1963) § 491, p. 497.)

The next contention is that the court erred in not giving complete instructions on involuntary manslaughter. Instructions on voluntary manslaughter were given but instructions on involuntary manslaughter were not given, though the People offered them. Verdict forms were submitted on voluntary manslaughter. The only possible reference to involuntary homicide was a portion of the instruction dealing with excusable homicide which stated: "Excusable homicide is distinguished from felonious homicide in that to be excusable the killing of the human being must have been by both accident and misfortune. Even though the death was accidental and may not have been intended and was not anticipated, the homicide will not be excused if it was caused by an unlawful act, or by the doing of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

■ " 'It is a settled rule that jury instructions must be responsive to the issues. The issues in a criminal case are determined by the evidence. . . . ■ *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. . . . That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based on the hypothesis it is entirely true.'* . . ." (*People* v. *Modesto*, 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33].) ■ Further a court is under a duty to instruct on general principles which are necessary for the jurors' understanding of the case. It need not instruct on specific points or special theories which might be applicable. (Witkin, Cal. Criminal Procedure (1963) § 472, p. 478.) The general principles of law governing a case are those commonly or closely and openly connected with the facts of the case before the court. (*People* v. *Wade*, 53 Cal.2d

322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) ▮ Lola insisted at all times she did not intend to kill Kreiss. It has been repeatedly held that a killing resulting from the negligent use of firearms is involuntary manslaughter. (*People* v. *Carmen,* 36 Cal.2d 768, 776 [228 P.2d 281].) We feel that on the record an instruction on involuntary manslaughter should have been given by the court. The facts, as testified to by Lola, strongly call for such an instruction. Involuntary manslaughter in this case was something more than ''a special point or special theory.'' It became an issue in the case and the jury should have been enlightened on the subject. The district attorney proposed such an instruction and it was refused. The fact that appellants did not propose it is no excuse for not giving the instruction. ▮ Where counsel for defendant, through ignorance, inadvertence or neglect fails to request instructions on material issues it is the duty of the court in criminal cases to give of its own motion instructions on the general principles of law pertinent to such case, even though they are not proposed or presented in writing by the parties themselves. (Witkin, Cal. Criminal Procedure (1963) § 471, pp. 477-478.)

We are not unmindful of the decision in *People* v. *Jackson,* 202 Cal.App.2d 179, 182 [20 Cal.Rptr. 592], wherein the court stated: ''Manslaughter is defined in Penal Code section 192 as the 'unlawful killing of a human being, without malice.' The section also states that there are three kinds, voluntary, involuntary and while driving a vehicle. . . . 'If the killing was manslaughter, it is not important that it be classified. The statute does not distinguish the kinds of manslaughter in prescribing the punishment, but, on the contrary, makes the punishment not exceeding ten years' imprisonment for manslaughter; and the question as to whether any case falls under the one head or the other does not appear to be material.''

While we have no fault to find with the *Jackson* case, we, nevertheless, do not believe it should be applied to the facts of the instant case. Here the court refused to instruct on involuntary manslaughter but did instruct on voluntary manslaughter. Further the court prepared and submitted to the jury only on verdict on the subject of manslaughter as follows:

''We the jury in the above-entitled action find the Defendant Lola Lorraine Bross GUILTY of the crime of violation of

Section 192, subdivision 1 of the Penal Code, manslaughter."

Subdivision 1 of the section is voluntary manslaughter committed upon a sudden quarrel or heat of passion. Having not been instructed on involuntary manslaughter and having been presented with a verdict applicable only to voluntary manslaughter prepared by the court, the jury could very reasonably assume that the court felt the crime did not involve involuntary manslaughter. True, as contended by the Attorney General the court was not required to prepare and submit forms of verdict. However, having done so, we are of the opinion that in fairness to the defendants the court should have instructed on involuntary manslaughter since Lola's testimony presented the issue. And while we are discussing the subject of degrees of manslaughter, can it be said in this case that it is not material whether the case falls under one head or the other? Is it not reasonable to assume that the Adult Authority, in determining the punishment, would fix the term of imprisonment for a shorter term when the crime was involuntary manslaughter than it would if the conviction were for voluntary manslaughter?

 Several statements of the district attorney in his summation to the jury are assigned as prejudicial error. We will only discuss a few which we feel were prejudicial misconduct. The district attorney quoted Lola as saying that she was going to kill Kreiss. She did not so testify. The district attorney also said that the "authorities . . . pretty well determined who was the wrongdoer . . . and who was the person who was actually causing all of the trouble. . . ." This permits an inference the district attorney had information not brought out in the case. Such argument would be improper. (*People* v. *Quigley*, 157 Cal.App.2d 223 [320 P.2d 936].) The district attorney said that the Brosses would kill again if they were given the opportunity. This was prejudicial error because there is no such evidence in the record. The district attorney repeatedly referred to Darrell as a coward and of a paranoid nature. This was improper. Objection is also made because the district attorney commented on the law of self-defense when he knew the court would not instruct on that doctrine. Such was improper as an attempt to inform the jury on an extraneous issue, which would be confusing.

Prior to the argument to the jury, counsel for the defendants and the district attorney entered into a stipulation that

objections to arguments would be made at the close of argument, consequently no objections were made during the argument presented by the district attorney. This stipulation was made in chambers and apparently was agreeable to the court.

At the close of the district attorney's opening summation, the court and counsel again retired to chambers and counsel for the appellants then and there, for the record, called the court's attention to the statements made by the district attorney which he contended constituted misconduct on the part of the district attorney, and he so assigned them. However, counsel did not request the court to admonish the jury to disregard them or instruct them as to the misconduct.

 The Attorney General in opposition to the above contention cites *People* v. *Simpson,* 203 Cal.App.2d 368, wherein the court stated at page 372 [21 Cal.Rptr. 541]: "'. . . Although counsel assigned this remark as prejudicial misconduct he made no request that the jury be instructed to disregard it, and we therefore cannot consider the merits of this contention. '[T]he defendant may not predicate error in this court in the absence of assignment of such alleged misconduct as error and a request to the trial court to instruct the jury to disregard it.' (*People* v. *Stembridge,* 99 Cal.App. 2d 15, 23 [221 P.2d 212].)'"

There are two exceptions to the general rule, however, as pointed out in *People* v. *Berryman,* 6 Cal.2d 331, at page 337 [57 P.2d 136]: "'. . . One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. In such cases the misconduct will furnish ground for a reversal of the judgment, even where proper admonitions are given by the court. [Citations.]'" Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved.

Applying the rule in the *Berryman* case, *supra,* concerning exceptions, we feel that the statements of the district attorney which we have heretofore mentioned fall within the second exception, especially the statements that Lola said she

was going to shoot Kreiss and that the Brosses would kill again if given the opportunity. These statements are not supported by the testimony in the case and were most prejudicial. Counsel may not, under the guise of argument, assert as facts matters not in evidence. (*People* v. *Love,* 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)

No other points presented in the briefs require discussion.

The judgments are reversed.

Pierce, P. J., and Friedman, J., concurred.