Filed 7/21/14  P. v. Machuca CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B243964 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA378237) |
| v. | |
| RENE MACHUCA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County. Kathleen Kennedy, Judge.  Affirmed as modified.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Rene Machuca.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Rosa Ayon.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellants Rene Machuca and Rosa Ayon were convicted by a jury in connection with the death of Alvaro Mora and each sentenced to 40 years to life in state prison. In separate appeals, they contend a host of issues warrants reversal of their judgments, including evidentiary error, instructional error, insufficient evidence, ineffective assistance of counsel, and prosecutorial misconduct. We modify the judgments to add one additional day of custody credits to each but otherwise affirm the judgments.

**FACTS**

Mora died from multiple gunshot wounds to his face, neck, abdomen, and left wrist on December 10, 2009. Efrain Gomez, Machuca and Ayon were charged with Mora's murder in an information dated July 7, 2011. In the first count, they were each charged with murder under Penal Code[1] section 187, subdivision (a) with further gang and firearm enhancement allegations under sections 186.22, subdivision (b) and 12022.53, subdivisions (b)-(e). In the second count, they were charged with shooting from a motor vehicle in violation of section 12034, subdivision (c) with further gang and firearm enhancement allegations under sections 186.22, subdivision (b) and 12022.53, subdivisions (d) and (e)(1). Prior to trial, Gomez pleaded no contest to a charge of voluntary manslaughter in violation of section 192, subdivision (a). He received a six year sentence in exchange for his truthful testimony at trial.

The People presented trial testimony from Gomez and Daisy Luna,[2] who is Ayon's half sister and Machuca's girlfriend. Both Luna and Gomez identified Ayon and Machuca as members of the 18th Street gang. Gomez testified that he knew Ayon and her family because he used to live across the street from them. When Ayon asked Gomez to give her a ride, he agreed. On December 10, 2009, Gomez picked up Ayon early in the morning and drove her to an office. They were there only five minutes. When they arrived back at Ayon's apartment building, Gomez asked if Ayon wanted to visit his sister with him. She agreed, but asked if Luna and Machuca could come as well. Gomez

---

[1]     All further section references are to the Penal Code unless otherwise specified.

[2]     Luna was also charged in connection with Mora's death. She pled guilty to accessory to murder and was sentenced to two years in state prison.

2

picked them up from their home nearby. Another man, David, was with them and also got into the car. On the way, Gomez stopped at a liquor store to buy beers for everyone. They then went to Gomez's sister's house, but she was not home.

As they left, Mora approached the van, yelling at them to stop. Mora was a rival gang member from the Drifters. Machuca and Ayon told Gomez to stop the van to see what Mora wanted. Ayon "banged on [Mora]" by asking him where he was from. Both Machuca and Ayon threw gang signs, yelling, "18th Street" at Mora. Mora also made gang signs. Mora thrust his arms into the passenger side window in an attempt to touch Ayon, who was sitting in the passenger seat. Ayon shrank back from him. Machuca, who was sitting behind Ayon, shot Mora multiple times. He then ordered Gomez, "Let's go." During the ride back, Machuca warned Gomez and the others not to say anything or "we knew what could happen to us." Gomez drove everyone back to Ayon's apartment building. When they arrived, they looked for shell casings inside the van but did not find any. Neither did they find any blood inside the van. Nevertheless, Gomez washed the van and ultimately, got rid of it.

In her trial testimony, Luna largely corroborated Gomez's version of events up until the shooting, but denied David was present. She also denied anyone told Gomez to stop the van. Luna testified she looked down during the altercation and did not see who fired the shots. In a previous interview with detectives, however, she admitted she heard Ayon and Machuca claiming 18th Street to Mora and that Machuca shot Mora. Luna also told the detectives that Ayon looked like she was about to get out of the car to confront Mora, but was prevented from doing so when he stuck his arms in the window. At trial, she explained she told the detectives what they wanted to hear because she was scared to lose Machuca. The detectives told her that he would go away for life if she did not say he shot Mora. After her interview with the detectives, Luna called her brother, who was also an 18th Street gang member. She told him that they "got us for 187," and that if Machuca said what he did, they would not give him that much time.

A neighbor, J.R., also testified at trial. She lived next to Gomez's sister. On the day in question, she observed four young people smoking and drinking beer while standing next to a brown van parked in front of her house. J.R. identified Machuca and Ayon as part of that group in a photographic lineup and at trial. J.R. then saw a fifth man, who was older than the others, get into the driver's seat. After they drove away, J.R. heard four shots fired and tires screech. When she went outside, she saw Mora lying on the ground, bleeding.

J.C., an FBI informant, testified that Machuca bragged about killing a member of the Drifters gang while hanging out with 18th Street gang members. J.C. reported the statements to his FBI handlers, who notified the Los Angeles Police Department. Subsequently, J.C. arranged to buy a gun from Machuca for $500 on December 31, 2009. During the purchase, Machuca referred to the gun as a "burner." J.C. explained the term was used by 18th Street gang members to refer to a gun that had been previously used in a murder. Subsequent testing showed the two bullets recovered from Mora's body and the three shell casings found at the scene came from the gun J.C. purchased from Machuca. The People also presented gang expert testimony.

A jury found Machuca and Ayon not guilty of first degree murder but guilty of the lesser included offense of second degree murder on count 1. Machuca was also found guilty of shooting from a motor vehicle on count 2. The special enhancements were all found true. They were both sentenced to 40 years to life in prison for count 1. Machuca's sentence on count 2 was stayed pursuant to section 654. Both timely appealed.

## DISCUSSION

Ayon and Machuca raise a number of claims of error on appeal, some overlapping. In particular, they contend evidentiary errors, insufficient evidence, instructional errors, prosecutorial misconduct, and ineffective assistance of counsel warrant a reversal of their judgments. We find no reason to reverse the judgments.

4

## I.     Evidentiary Error

Ayon challenges two of the trial court's evidentiary rulings.  Specifically, the admission of J.C.'s testimony and evidence of Ayon's tattoos.  We find no error.

### A.  Admission of J.C.'s Testimony

At trial, J.C. testified that Machuca admitted to shooting Mora, but also implicated Ayon in his comments.  J.C. explained he joined the 18th Street gang when he was 15 or 16 years old.  At 17, he decided he wanted to move out of the neighborhood and get out of the gang life.  He asked his probation officer if he could work for the FBI.  She put him in touch with the FBI and he became a paid informant who reported to two agents.  His family was relocated by the FBI.

Sometime in December of 2009, J.C. was present with Machuca and a few other 18th Street gang members when Machuca bragged that he had "just killed a dumb fuck," referring to a member of the Drifters, a rival gang.  Machuca told the gang members Ayon "banged on some guy.  He banged back.  He said a rival gang.  He approached the car, and [Machuca] shot him in the face."  Machuca said he shot the victim three times as he tried to cover his face with his hand.  They drove off with "his brain splatter on the van."  Machuca admitted he was with Ayon, Luna, and Gomez along with another man.  J.C. also testified Machuca told them that, afterwards, Ayon was "just laughing and saying, 'fuck that guy, fuck that guy.'"  J.C. reported the conversation to his FBI handlers the next morning.

At the time the prosecutor sought to introduce J.C.'s testimony, Ayon's trial counsel objected on hearsay and *Aranda/Bruton*[3] grounds.  Ayon's trial counsel argued that, at a minimum, the statement should be sanitized to exclude reference to Ayon "banging" on the victim first and laughing about the incident afterwards.  He further believed the statement was inadmissible under Evidence Code section 352.  After consideration of the parties' arguments and briefing the following day, the trial court

---

[3]     *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*).

allowed J.C.'s testimony to be admitted.  It found the statements by Machuca were not testimonial, but were declarations against penal interest.

### 1. *Aranda/Bruton*

Ayon contends the trial court erred in admitting J.C.'s testimony into evidence because it violated her Sixth Amendment right of confrontation.  The confrontation clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  The confrontation clause does not apply to nontestimonial hearsay statements by codefendants, however.  (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571 (*Arceo*).)  While Ayon concedes Machuca's out-of-court statement was not testimonial, she suggests the issue of whether the confrontation clause applies to nontestimonial statements still appears unresolved in California, citing to *People v. Garcia* (2008) 168 Cal.App.4th 261, 282, footnote 12.  As we explained in detail in *Arceo*, however, federal courts since *Garcia* have expressly held that the confrontation clause does not apply to nontestimonial statements.  (*Arceo, supra,* at pp. 574-575.)  Thus, the admission of Machuca's statements to the 18th Street gang members did not violate the confrontation clause.

Nevertheless, Ayon contends Machuca's statement is inadmissible hearsay under the *Aranda/Bruton* rule.  The *Aranda/Bruton* rule bars the admission of one defendant's out-of-court confession incriminating a codefendant, even if the court instructs the jury to consider the confession only against the declarant.  (*Aranda, supra,* 63 Cal.2d at pp. 529-530; *Bruton, supra,* 391 U.S. at pp. 135-136.)  Under such circumstances, the trial court must either sever the trials or redact the statement to avoid references to the codefendant.  (*Aranda, supra*, 63 Cal.2d at pp. 530-531.)  The *Aranda/Bruton* rule presumes the out-of-court statement is admissible against the declarant and inadmissible hearsay against the codefendant.  (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.)  Thus, the hearsay statement against the codefendant is admissible under the *Aranda/Bruton* rule if it falls within a "firmly rooted" hearsay exception or is " 'supported by a showing of particularized guarantees of trustworthiness.' "  (*United States v. Moses* (3d Cir. 1998)

6

148 F.3d 277, 281, quoting *Idaho v. Wright* (1990) 497 U.S. 805, 816-817.) If the statement is admissible against the codefendant under a hearsay exception, the jury may consider it and there is no reason for severance or redaction. (*People v. Smith* (2005) 135 Cal.App.4th 914, 921; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 334-335.) We review the trial court's admission of J.C.'s testimony for an abuse of discretion. (*People v. Smith, supra,* 135 Cal.App.4th at p. 923; see also *People v. Brown* (2003) 31 Cal.4th 518, 534.)

Here, J.C.'s testimony was admissible as a hearsay exception because Machuca's statements were against his own penal interest. Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

Generally, the hearsay exception for a declaration against penal interest is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441, fn. omitted.) Under *Leach*, "a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' " (*People v. Duarte* (2000) 24 Cal.4th 603, 612.) However, a statement that inculpates the declarant and other individuals need not be excluded so long as the statement is not exculpatory, self-serving, or collateral. (*People v. Samuels* (2005) 36 Cal.4th 96, 120 (*Samuels*).)

In *Arceo*, *supra,* 195 Cal.App.4th at page 562, the defendant was a gang member who was charged with two murders and with conspiracy to commit those murders. The defendant objected to a witness's testimony that an accomplice made boastful statements

7

about the murders and described how the defendant shot one of the victims when she resisted. (*Id*. at p. 576.) We held that, to the extent the accomplice's boastful statements admitting his own involvement implicated the defendant, the statements were declarations against interest and admissible under Evidence Code section 1230. (*Ibid.*) The statements subjected the accomplice to criminal liability, and statements that genuinely and specifically inculpate the declarant provide particularized guarantees of trustworthiness. (*Arceo, supra,* at p. 576.) Thus, the fact that a declarant believes the criminal acts were worthy of bragging about does not diminish the reality of that declarant's susceptibility to criminal liability. The accomplice's admission of his involvement patently disserved his penal interests. (*Id*. at p. 577.) Adding to the statements' trustworthiness was the fact that they were not made in a custodial context or in a context that shifted the blame to another. (*Ibid.*)

In *Samuels*, the defendant asked James Bernstein to murder her husband, and once Bernstein had done so, she solicited two other men to murder Bernstein. At the defendant's trial, a witness testified Bernstein told him, " 'He had done it and Mike . . . had helped him. And that [the defendant] had paid him.' " (*Samuels, supra,* at p. 120.) On appeal, the defendant contended the comment that she paid Bernstein was an attempt to shift blame to her, and was therefore not a statement against Bernstein's penal interest. (*Ibid*.) The Supreme Court held the entire statement was properly admitted as a declaration against penal interest, notwithstanding the reference to the defendant, because the "admission, volunteered to an acquaintance, was specifically disserving to Bernstein's interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to [the] defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of Bernstein's precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id.* at p. 121.)

8

Here, Machuca admitted he pulled the trigger. There is no question this admission was against his own interests. Machuca's statements subjected him to criminal liability to such an extent that a reasonable man in his position would not have made the statements unless he believed them to be true. As in *Arceo*, the statements were not made to deflect blame to Ayon or anyone else. It is clear Machuca's statements are in no way exculpatory, self-serving, or collateral. Machuca's references to Ayon were an integral part of the incriminating statement. Like *Samuels*, to the extent the remarks discuss Ayon's involvement in the shooting, these remarks were not collateral. They showed why Mora approached the van (in response to Ayon claiming 18th Street membership). They were in fact quite damaging to Machuca because they implied his and Ayon's actions were made to benefit the 18th Street gang. (*Samuels, supra*, 36 Cal.4th at p. 121; see also *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176-177.) Applying the reasoning in *Samuels* and *Arceo,* we conclude Machuca's entire statement was admissible.

Ayon relies on *People v. Shipe* (1975) 49 Cal.App.3d 343 (*Shipe*) to argue the statement was inadmissible. *Shipe* is instructive, but does not aid her cause. In *Shipe*, three defendants were charged with the murder of a drug dealer. Two of the defendants pled guilty to a lesser offense and made statements to the authorities which blamed the third defendant for stabbing the victim. At trial, the two defendants refused to answer questions from the prosecutor on Fifth Amendment grounds. The trial court then allowed the prosecutor to treat the defendants as hostile witnesses and question them with leading questions which tended to establish the third defendant's guilt. The Court of Appeal held the third defendant's constitutional right of confrontation was violated and reversed the judgment. (*Id.* at p. 345.)

Noting that there would likely be a second trial, the Court of Appeal offered some guidance to the trial court regarding whether the statements made by the two defendants would be admissible under a hearsay exception. The court explained, "Each confession was made when the declarant had a motive for lying, and it is significant that each exculpated himself of the greater offense of murder in the first degree while admitting

9

lesser transgressions.  It is also significant that each declarant was permitted to enter a plea of guilty to a lesser offense.  In our view, the statements in question do not come within section 1230 of the Evidence Code and are not clothed with sufficient indicia of reliability to satisfy the confrontation clause of the United States Constitution." (*Shipe, supra*, at p. 353.)

The court further held that "to satisfy the requirements of section 1230 of the Evidence Code and the confrontation clause of the United States Constitution, a declaration against penal interest must be 'distinctly' against the declarant's penal interest [citation omitted] and must be clothed with indicia of reliability; such indicia of reliability are lacking where the declaration is made to authorities after the declarant has been arrested and charged with a serious offense or after he has pled guilty to a lesser offense and is awaiting sentencing and where, as here, the statement is exculpatory in the sense that the declarant has blamed a coparticipant for the commission of the greater offense while admitting complicity to some lesser degree." (*Shipe, supra,* at p. 354, fn. omitted.)

Unlike in *Shipe*, Machuca's statement was "distinctly" against his penal interest, as discussed above.  Further, the statement was "clothed with indicia of reliability." The confession was made to a group of fellow gang members.  Machuca did not attempt to exculpate himself of the greater offense while inculpating Ayon or anyone else.  That J.C. was a paid informant does not render his testimony as to Machuca's out-of-court statements inherently untrustworthy, as Ayon contends.  Indeed, Machuca's description to J.C. of how he shot Mora was entirely consistent with the crime scene analysis—that is, Mora was shot at close range, he was shot in the face and the hand because he used his hand to cover his face, and the shooter used a .40-caliber handgun.  J.C. would not have known these details of the shooting without being told about them by the shooter. Moreover, the jury heard J.C. describe his role with the FBI, including that the FBI relocated his family and had paid him $33,400 to date.  They were instructed to take into consideration whether a "witness's testimony [was] influenced by a factor such as bias or prejudice . . . or a personal interest in how the case is decided" as well as whether a

10

"witness [was] promised . . . anything of value in exchange for his or her testimony[.]" We presume the jury understood and obeyed that instruction and deemed J.C. credible despite his work with the FBI. (*People v. Pinholster* (1992) 1 Cal.4th 865, 925, disapproved on different grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.)

## 2. Evidence Code Section 352

Ayon further contends the prejudice from the admission of Machuca's out-of-court statement implicating her outweighed any probative value under Evidence Code section 352. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Ayon contends the evidence showed Ayon was criminally oriented with an exceptionally bad character while failing to show Ayon facilitating the commission of any crime. We disagree. Machuca's statement showed Ayon instigated the altercation by "banging" first and then laughing about it. As discussed below, this was highly probative of her guilt as an aider and abettor. It also tended to prove that she committed the crime to benefit the 18th Street gang. The trial court did not abuse its discretion in admitting the evidence.

## B. Admission of Ayon's Gang Tattoos

Ayon argues Evidence Code section 352 prohibited the admission of her gang tattoos. Prior to presenting testimony, the prosecutor asked to take pictures of Ayon's numerous tattoos. The trial court allowed the photographs over defense counsel's objections because they were "relevant on the issue of the gang incident, presumably." The detective assigned to the case used the photographs of the tattoos to explain the meaning of each gang-related tattoo. The gang expert also opined that Ayon was a gang member, based on her prior admissions and the gang tattoos. In particular, Ayon had at least six tattoos on her body reflecting the number 18 or the letter "E," representing the 18th Street gang. The homicide detective identified a tattoo of a devil and "Fuck my enemies" on Ayon's upper forearm as well as the words "What Bitch" with the letter "B"

11

crossed out on her neck.  The detective explained the letter "B" represented blood gangs who are enemies of 18th Street gang.

Photos of gang-related tattoos "'are admissible even if repetitive of other evidence, provided their probative value is not substantially outweighed by their prejudicial effect.' [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 134.)  Courts have repeatedly held that the admission of gang-related tattoos was proper.  (*People v. Albillar* (2010) 51 Cal.4th 47, 62 [gang-related body tattoos probative of attack as gang-, not family-, related]; *People v. Ochoa* (2001) 26 Cal.4th 398, 438-439 [testimony that defendant's tattoos signified his hardcore gang status properly admitted]; *People v. Parrish* (2007) 152 Cal.App.4th 263, 279 [expert testimony that gang tattoos signified loyalty to gang admissible notwithstanding Evidence Code section 352 objection].)

Evidence of  Ayon's gang tattoos had substantial probative value because it corroborated the testimony of the gang expert and homicide detective that Ayon was a member of the 18th Street gang.  The fact that Ayon had acquired so many gang tattoos tended to show her level of commitment to the gang, which in turn strengthened the inference that the crime was committed to benefit the gang, which was relevant to show motive on the murder charge as well as the gang enhancement allegations.  Moreover, Ayon's tattoos showing "Fuck my enemies" and "What Bitch" demonstrated Ayon's aggression towards those she considered to be enemies and that she was not afraid to confront them.

Against the substantial probative value of the photographs, the court properly weighed the risk of undue prejudice created by their admission.  Given the testimonial evidence of appellant's gang membership and the evidence Ayon initiated the confrontation by "banging" first, the tattoo evidence did not cause the jury to prejudge Ayon in violation of Evidence Code section 352.  Further, the jury was instructed that gang evidence was not to be used to conclude that Ayon was a person of bad character or had a disposition to commit crime.  We presume the jury followed these instructions. (*People v. Pinholster, supra,* 1 Cal.4th at p. 925.)  The trial court's decision to admit the

photographs was not arbitrary, capricious or patently absurd, and did not result in a manifest miscarriage of justice.

This is in stark contrast to the gang evidence presented in *People v. Albarran* (2007) 149 Cal.App.4th 214, a case relied upon by Ayon. There, the court held certain gang evidence had no connection to the underlying crimes and was so extraordinarily prejudicial that it raised the distinct potential to sway the jury to convict regardless of defendant's actual guilt. The court explained, "Evidence of [defendant's] gang involvement, standing alone, was sufficient proof of gang motive. Evidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any other material issue relating to [defendant's] guilt on the charged crimes and approached being classified as overkill." (*Id.* at p. 228, fn. omitted.) *Albarran* provides little guidance to our case because it involved the introduction of evidence of other gang members' criminal activities. Unlike Ayon's tattoos, the evidence presented in *Albarran* had no relevance to a gang enhancement allegation and little relevance to the underlying crimes.

## II. Sufficiency of the Evidence

Appellants both contend the evidence was insufficient to support their convictions for second degree murder. We find substantial evidence in the record.

### A. Standard of Review

"[O]ur role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "In reviewing the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509.) Substantial evidence is evidence that is " 'reasonable in nature, credible, and of solid value.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of

13

evidence." ' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. (*Ibid*.) Thus, reversal of the judgment is not warranted if the circumstances reasonably justify the trier of fact's findings, even though we, as the reviewing court, might have reached a contrary finding from these facts. (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.)

### B. Ayon

At trial, the prosecutor presented two theories of criminal liability to the jury as to Ayon: (1) she aided and abetted the murder of Mora and (2) she aided and abetted the target crime of assault with force likely to cause great bodily injury and Mora's murder was a natural and probable consequence of that target crime. Under the latter theory, the prosecutor argued that Machuca shooting Mora was a natural and probable consequence of an assault on Mora. Ayon argues the evidence is insufficient to sustain her conviction because there was no evidence she intended to commit an assault with force likely to cause great bodily injury, knew Machuca sought to commit that crime, or did anything to facilitate the assault. Ayon did not know Machuca was armed or that he intended to shoot Mora. Further, no one discussed shooting anyone prior to leaving for Gomez's sister's house. We need not address the aiding and abetting theory posited by the prosecutor because substantial evidence supports the murder conviction based on a natural and probable consequence theory.

An aider and abettor is guilty of not only the intended crime, but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. (*People v. Prettyman* (1996) 14 Cal.4th 248 260-262.) Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 535.) A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case and is a factual issue to be resolved by the jury. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376.)

14

To find liability under a natural and probable consequences theory, "the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman, supra*, 14 Cal.4th at p. 262, fn. omitted.)

The natural and probable consequences doctrine has been found in a murder context where a violent crime such as an assault or armed robbery leads to murder. (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913, 922 [gang assault and murder]; *People v. Prettyman*, *supra,* 14 Cal.4th 248, 262 [robbery and murder].) Further, in *People v. Montes* (1999) 74 Cal.App.4th 1050 (*Montes*), the court found attempted murder was a natural and probable consequence of simple assault and breach of the peace by fighting in public, even though the defendant did not know the perpetrator had a gun. (*Id*. at pp. 1055-1056.) The court relied on expert testimony that it is the nature of modern gang warfare that verbal taunting can quickly give way to physical violence and gunfire. (*Ibid*.)

In examining the record in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the shooting was a reasonably foreseeable consequence of the intended assault. The record shows that Ayon and Machuca are high-ranking members of the 18th Street gang. They were in 18th Street territory at the time of the incident. Mora was a member of a rival gang, the Drifters. Both Ayon and Machuca told Gomez to stop the car when they noticed Mora throwing gang signs in the street. Ayon initiated the confrontation when she "banged" on Mora by asking where he was from.

15

The gang expert testified that respect is "everything" to a gang, particularly within its territory. Moreover, violence is used as a response to disrespectful behavior and disagreement. According to the gang expert, a gang member's query "where are you from?" means "what gang are you from?" and is a verbal challenge, which (depending on the response) could lead to a physical altercation and even death. The expert affirmed that a gang member who asks, "where are you from?" could be armed and probably would be prepared to respond with violence, ranging from a fistfight to homicide.

Ayon contends none of the above evidence constituted evidence of conduct facilitating an assault crime. According to Ayon, mere words, even if threatening, do not constitute an assault or facilitate one. (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1603.) Further, Ayon contends murder was not a reasonably foreseeable consequence of her calling out her gang name, even if it facilitated a crime. However, the record shows Ayon went beyond merely speaking threatening words.[4] Luna stated Ayon appeared to want to exit the van to physically confront Mora. That she subsequently drew back when he stuck his arms through her window does not undo her initial impulse to exit the van. In any event, the natural and probable consequences theory does not require that Ayon complete an assault, simply that she intend to aid and abet an assault and also commit some act that aided or promoted an assault. (*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1453.) Further, the gang expert's testimony shows Ayon knew Machuca would respond violently to a gang challenge. It is also substantial evidence that the target offense of assault was closely connected to the shooting. (*Montes, supra,* 74 Cal.App.4th at p. 1055.)

Ayon's words and actions were substantial evidence she intended to aid and abet an assault and committed an act to promote an assault. Ayon's conduct is distinguishable from that found in *People v. Rodriguez* (1986) 42 Cal.3d 730, and *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262. In both *Rodriguez* and *Juan*

---

[4]    Given Ayon's additional conduct, we need not decide here whether simply making gang signs or asking, "where are you from?" is enough to implicate the natural and probable consequences theory.

Ayon's remaining contentions are easily addressed. She contends that her gang membership or presence with fellow gang members did not prove intent, aid or other necessary action for aiding and abetting. While it is true that these alone will not establish aiding and abetting liability, the record shows more than mere gang membership or presence, as discussed above. It was also unnecessary to show that she knew Machuca had a gun or discussed killing someone. (*Montes, supra,* 74 Cal.App.4th at p. 1056 ["[g]iven the great potential for escalating violence during gang confrontations, it is immaterial whether [defendant] specifically knew [fellow gang member] had a gun" or previously discussed shooting anyone]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 501, fn. 5 ["although evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of a homicide, it is not a necessary prerequisite"]; *People v. Montano* (1979) 96 Cal.App.3d 221, 227 [defendant's liability for aiding and abetting attempted murder not dependent on awareness that fellow gang members possessed deadly weapons].)

## C. Machuca

Machuca contends the evidence was insufficient to support the verdict of second degree murder (count 1) or shooting from a motor vehicle (count 2) because the record lacked substantial evidence to support a finding that he acted with malice. Instead, he argues, the evidence was overwhelming he acted with lawful justification, requiring reversal of the conviction. Machuca argues the People failed to adduce substantial evidence of express or implied malice because the evidence showed that Mora was the aggressor from the outset and Machuca had no way of knowing whether Mora had a gun or not. This is merely an improper attempt to re-argue the evidence.

Murder is defined in the Penal Code as "the unlawful killing of a human being, or a fetus, with malice aforethought." (§§ 187, subd. (a), 189 [second degree murder is murder that is not willful, deliberate and premeditated].) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and

17

malignant heart." (§ 188.) Malice may be established where the evidence showed that a defendant acted intentionally by shooting the victim twice at close range. (*People v. Ramirez* (2006) 39 Cal.4th 398, 465.)

Here, there is ample evidence of malice. Machuca shot Mora multiple times at close range in the face. Indeed, Mora had raised his hands to cover his face. Particularly relevant to the issue of Machuca's state of mind, is the fact that Machuca bragged about killing a "dumb fuck" to his fellow gang members the following day. Ultimately, the question here is not whether substantial evidence supports Machuca's self-serving conclusion that he acted without malice and in defense of Ayon. Our review is instead limited to whether substantial evidence supports the jury's verdict. It does.

Machuca ignores the evidence identified above and instead argues he acted in defense of Ayon. To support his position, Machuca attempts to reargue the evidence, relying on "critical facts" that Ayon was being attacked by a rival gang member on drugs and that Machuca reacted with what he reasonably and justifiably believed was necessary violence to protect her. We disagree.

Any right of self-defense or defense of others is limited to the use of such force as is reasonable under the circumstances. (*People v. Clark* (1982) 130 Cal.App.3d 371, 380.) The right of self-defense or defense of others does not provide a defendant with any justification or excuse for using deadly force to repel a nonlethal attack. (*Ibid*.) "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact." (*Id.* at p. 379.)

The "critical facts" relied upon by Machuca may have shown he had the right to defend Ayon against Mora's attack (a conclusion we need not reach), but they do not establish that the use of deadly force was justified. Although it was established that gang

members often carry guns and that Mora was a gang member, there was no indication that he threatened anyone in the van with a gun. Mora had the opportunity to brandish a weapon as he approached the van, but did not. He also had both arms in the window at the time of the shooting, in full view. There was no evidence he was reaching into his pocket for a weapon or that his hands were out of Machuca's line of sight. Both Luna and Gomez testified he did not have a weapon and subsequent investigation showed he did not have a weapon. In light of the evidence, a reasonable jury could have found beyond a reasonable doubt that Machuca's use of deadly force against Mora was not justified. On appeal, we may not interject ourselves into the fact finding role. (*People v. Clark, supra,* 130 Cal.App.3d at p. 381.)

### D. Gang Allegations

Machuca also contends there was insufficient evidence to support the true finding by the jury that he committed the crimes for the benefit of a criminal street gang under section 186.22, subdivision (b). "To establish a gang enhancement allegation, 'the prosecution must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 625; *see also People v. Margarejo* (2008) 162 Cal.App.4th 102, 108.) There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, "we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say." (*Margarejo, supra,* at p. 110.)

Machuca contends, "there was no specific evidence upon which Lee [the gang expert] tried to conclude the shooting was committed for the benefit of the gang other than appellant was a member of the gang, and the crime was committed." Instead, the evidence showed that Machuca's actions were solely intended to protect Ayon, not to promote the gang. Machuca ignores a panoply of evidence that shows he committed the crime to benefit the 18th Street gang.

19

The gang expert testified that respect was "everything for a gang." Fear of the gang was the equivalent to respect, which allowed a gang to commit crimes with no repercussions since members of the community would be afraid to report their activities. It also allowed the gang to control its territory. If, for example, a rival gang member "hits up" an 18th Street gang member—asks "where are you from?"— and the 18th Street gang member ran away, that would be a loss of respect for the gang. The 18th Street gang member would be subject to discipline. Indeed, the gang expert testified that asking a rival gang member where he was from would inevitably lead to a physical fight or shooting. Presented with a hypothetical situation with facts substantially similar to those in this case, the gang expert opined that the shooting was done in furtherance of the gang. The gang expert testified that if two members of the 18th Street gang claimed their gang, "then the person outside claims his gang and walks up to the car showing no fear, in my opinion, if they do not confront or do something to that rival gang member and just drive away, it is a loss of respect and a loss of face for the gang that they can face discipline for." Shooting a rival gang member would also elevate the shooter's status within the gang.

There was sufficient evidence for the jury to conclude Machuca committed the charged offenses for the benefit of the 18th Street gang. It is undisputed that both Ayon and Machuca are members of the 18th Street gang. The gang expert's testimony demonstrated how Ayon and Machuca's actions benefitted the 18th Street gang by commanding respect for the gang and eliminating its rivals. Ayon and Machuca risked facing discipline if they did not "confront or do something to" Mora, a rival gang member, who defiantly declared his own affiliation to the Drifters in 18th Street territory. Moreover, Machuca bragged about the shooting the following day, highlighting both his actions and Ayon's participation.

Sufficient evidence to support a gang enhancement allegation has been found in similar cases. (*See e.g., People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [murder of non-gang member benefitted defendant's gang because "violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents

20

who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang. . . .' " and such fear and intimidation "obviously, makes it easier for the gang to continue committing the crimes for which it is known, from graffiti to murder"]; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [gang allegation supported where shooting by Latino gang member occurred in African-American gang territory and expert testified that shootings of African-American men benefitted Latino gang by elevating status of shooters and their gang].)

The courts in each of cases relied upon by Machuca held that the expert's testimony alone or the defendant's status as a gang member alone was not sufficient to support a gang finding. (*See People v. Martinez* (2004) 116 Cal.App.4th 753; *People v. Ferraez* (2003) 112 Cal.App.4th 925; *In re Frank S.* (2006) 141 Cal.App.4th 1192.) As discussed above, the prosecution did not rely solely on the gang expert's testimony to convict Machuca. Machuca's own actions in bragging about his kill and in declaring his affiliation supported the gang expert's testimony.

## III. Instructional Error

### A. Natural and Probable Consequence Theory

The trial court instructed the jury on the natural and probable consequence theory and defined the target offense of assault by means of force likely to cause great bodily injury under CALCRIM Nos. 403 and 875. Ayon contends the trial court erred in giving the natural and probable instruction since the evidence did not support it. (*People v. Ward* (2005) 36 Cal.4th 186.) We disagree. "The trial court should grant a prosecutor's request that the jury be instructed on the 'natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense. If this test is not satisfied, the instruction should not be given, even if specifically requested." (*People v. Prettyman*, *supra,* 14 Cal.4th at p. 269.) As discussed above,

21

substantial evidence supported a natural and probable consequence theory. Moreover, a jury reasonably could find the shooting was a natural and probable consequence of an assault. There was no error in giving the instruction.

**B. Voluntary Intoxication Instruction**

At trial, Gomez testified he purchased beer for everyone on the way to his sister's house. Luna corroborated Gomez's testimony, although she initially reported to the police that everyone had "a 40 each" and later testified at trial they were all sharing two beers. Rodriguez also observed four people drinking beer by Gomez's van. Appellants contend this evidence supports the inference they were intoxicated and supports jury instructions on voluntary intoxication. (CALJIC No. 4.21; CALCRIM No. 406.)

Appellants, however, admit their trial counsel did not request any instruction on the subject. As a result, they have forfeited the claim on appeal. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295 [voluntary intoxication is a pinpoint instruction that trial court is not required to give unless requested]; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1236 [claim of error is forfeited where defendant failed to request pinpoint instruction].)

Appellants argue they received ineffective assistance of counsel as a result of their trial counsels' failure to request the pinpoint instruction on voluntary intoxication. We reject Ayon and Machuca's attempt to avoid forfeiture. In *Strickland v. Washington* (1984) 466 U.S. 668, the Supreme Court established that "[t]he claim of ineffective assistance of counsel involves two components, a showing the counsel's performance was deficient and proof of actual prejudice. [Citations.]" (*People v. Garrison* (1989) 47 Cal.3d 746, 786.) On a direct appeal, a conviction will be reversed for ineffective assistance of counsel only where the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 442; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [" 'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there

22

simply could be no satisfactory explanation," [citation], the contention [that counsel provided ineffective assistance] must be rejected.' "].)

As explained by the high court in *People v. Wader* (1993) 5 Cal.4th 610, 643, "[a]n instruction on voluntary intoxication as negating specific intent would have been inconsistent with defendant's theory of the case." Appellants argued that Mora initiated the confrontation and Machuca shot Mora in defense of Ayon. Appellant' theory was that Machuca had the specific intent to shoot Mora, but only in defense of Ayon. That theory is inconsistent with an argument that he was too intoxicated to form the requisite intent. "Accordingly, we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (*Wader, supra,* 5 Cal.4th at p. 643.)

In any event, even if Appellants had requested a voluntary intoxication instruction, the trial court would properly have refused it because "[a] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677, quoting *People v. Horton* (1995) 11 Cal.4th 1068, 1119.) Though there is evidence showing Ayon and Machuca drank beer that day, there is not substantial evidence to show they were intoxicated or that they were unable to form the intent necessary to commit the crime as a result of their intoxication. "Normally, merely showing that the defendant had consumed alcohol or used drugs before the offense, without any showing of their effect on him, is not enough to warrant an instruction." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1241; *People v. Bandhauer* (1967) 66 Cal.2d 524, 528.)

*People v. Ramirez* (1990) 50 Cal.3d 1158, 1180-1181 presents similar facts and is instructive. There, the defendant testified he had eight to ten beers prior to the incident. However, no witness, including the defendant, testified that his beer drinking had any noticeable effect on his mental state or actions. The Supreme Court concluded: "Because in this case there was no evidence presented at the guilt phase suggesting that defendant's drinking had affected his mental state in a manner that might negate the specific intent or

23

mental state required for first degree murder, the trial court did not err in failing to instruct the jury pursuant to CALJIC No. 4.21 [voluntary intoxication] with regard to the first degree murder charge." (*Id.* at p. 1181, fn. omitted; see also *People v. Mills* (1977) 73 Cal.App.3d 539, 544; *People v. Juarez* (1968) 258 Cal.App.2d 349.)

Ayon's reliance on *People v. Vasquez* (1972) 29 Cal.App.3d 81 (*Vasquez*) and *People v. Stevenson* (1978) 79 Cal.App.3d 976 (*Stevenson*) is misplaced. In *Vasquez,* there was conflicting evidence that the defendant was impaired as a result of alcohol consumption. The defendant testified he argued with his wife about his drinking, she refused to give him any money to buy more alcohol, and she drove that evening because he had been drinking too much. On the other hand, the defendant also admitted he was not drunk at 6 p.m. and that the highway patrolman who gave him a ticket around that time did not smell alcohol on him or believe him to be intoxicated. (*Vasquez, supra,* at p. 88.) As the trial court was not permitted to weigh the evidence or judge the witness' credibility, it was error under the circumstances for the trial court not to give the voluntary intoxication instruction. (*Id.* at p. 89.) As explained by the court in *Stevenson,* "Even where there is conflicting evidence on this issue, nevertheless the law requires that ' "[however] incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true." ' [Citations.]" (*Stevenson, supra,* 79 Cal.App.3d at p. 985, italics omitted; *People v. Lemus* (1988) 203 Cal.App.3d 470, 477.)

Here, there is no evidence that either Ayon or Machuca were intoxicated despite evidence they consumed beer during their visit to Gomez's sister. Rodriguez, the neighbor, testified she saw four people drinking by a brown van, but did not observe that they behaved as if they were intoxicated. Luna testified she was drunk, but "I don't' know about everything [else]." Neither did Gomez or Luna testify that Ayon or Machuca were acting as if they were intoxicated, though they noted that Mora acted erratically. That Luna initially told the police "we were all drunk," without more, is

24

insufficient to contradict her subsequent trial testimony. Certainly, Machuca had the presence of mind to warn everyone not to speak of what had transpired as they drove home. Also, everyone, including Machuca and Ayon, conducted a thorough search of the van for shells shortly afterwards. These acts do not indicate an impaired mind. Under the circumstances, we follow the analysis in *Ramirez* and find no error in the failure to instruct the jury on voluntary intoxication. Neither do we find ineffective assistance of counsel in the failure to request such an instruction.

## IV. Prosecutorial Misconduct

Appellants claim the prosecutor committed misconduct during her closing argument. Appellants are barred from challenging the prosecutor's comments on appeal. Neither defense counsel objected at trial to any of the statements they now challenge on appeal. "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution. [Citations.]" (*People v. Green* (1980) 27 Cal.3d 1, 34, overruled on other grounds as noted in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1155, fn. 8.) After examining the record, we see no reason why a prompt objection and admonition could not have cured any harm caused by the statements to which Appellants object. (*People v. Lucas, supra,* 12 Cal.4th at p. 473.) Nevertheless, we consider the claims on the merits because of their alternative ineffective assistance of counsel argument. (*People v. Cain* (1995) 10 Cal.4th 1, 48.) In so doing, we find no misconduct and reject Appellants' ineffective assistance of counsel argument. (*Ibid*.)

### A. Standard of Review

The applicable federal and state standards regarding prosecutorial misconduct are well established. " ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v.*

*Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' (*People v. Espinoza, supra*, 3 Cal.4th at p. 820.)" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

" ' "[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . .' " ' [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

**B. Misstatement of the Law on Self-Defense**

Appellants assert a host of errors associated with the prosecutor's closing argument, particularly as it related to their theory of self-defense or defense of others. Appellants argue that the prosecutor improperly urged the jury to disregard lawfully given instructions, misstated the law on self-defense, and argued facts not in evidence.

We can quickly dispense with the first argument—that the prosecutor improperly urged the jury to ignore the instructions on self-defense. At closing, the prosecutor stated: "Members of the jury, it is undisputed in this case that Mr. Mora did not have a weapon in his hands. [¶] You have all these instructions, and I am going to tell you you can disregard the instructions on self-defense and defense of others because they are contrived. This is a convenient thing for them to say to you now that we are concluded, and we have all these jury instructions. [¶] . . . they have had eleven months before the detectives even arrested them and talked to them, members of the jury, they have had eleven months to get their stories straight. [¶] They have had eleven months to come up with, 'Okay, if we ever get found out we can say that it was self-defense, right? Because

26

the guy came up to the van.  We can say he had a gun or we saw something, or he was going to shoot us.  We can say that.'"

Taken in context, it is obvious the prosecutor urged the jury to disregard the self-defense instructions because the prosecution's argument was that self-defense or defense of others did not apply to this case.  Her comments here plainly show she believed Ayon and Machuca concocted the self-defense theory.  Indeed, the prosecutor later commented, "So I am going to ask you to ignore these instructions—I mean—when I say ignore, obviously look at them, but I believe that you will find that they do not apply in this case under these set of circumstances and these set of facts as you find them."  This is a proper argument to present to the jury.

Next, Ayon and Machuca contend the prosecutor mislead the jury when she argued defense of others did not apply if:  (1) Mora did not have a weapon; (2) Mora did not use lethal force; and (3) appellants were not in fear.  We repeat the challenged statements below and include, to the extent necessary, the comments surrounding the statements to provide context.

"Members of the jury, it is undisputed in this case that Mr. Mora did not have a weapon in his hands."

"So self-defense and defense of others is a non-issue.  [¶]  There is no self-defense in this case.  There is no weapon.  There is no reason that this ever needed to escalate for a gun to be pulled out."

"And you heard Detective Holmes and Detective Evens give her [Luna] every opportunity, all day long, to say it was self-defense.  He was protecting Rosa.  He was protecting himself.  [¶]  He gave her every opportunity.  You can hear it in the tape.  'Hey, if my partner was in the same trouble'—you know, he is trying to get her to say it was self-defense.  [¶] Members of the jury, she never said it.  And that's why we are here today. She never said it.  [¶]  He even asked her . . . "did he have a gun?'  [¶]  'No, I didn't see a gun.'  [¶]  Well, did he have a stick?  Did he have a hand grenade.'  [¶]  There was some laughter.  'No.'  [¶]  Because there was

27

nothing in his hands. She said that to him. He gave her those opportunities; she didn't take it. And the reason why, members of the jury, is because it is not self-defense. It wasn't self-defense."

"There is no self-defense. There is no defense of others. There is no fear of anyone involved. These are 18th Street gang members in their hood in a car five deep with a weapon, and some homeless, drug-addicted gang member comes up to them. Do you think that they are afraid, members of the jury?"

"We know he did not have a weapon. First of all, Daisy Luna and Mr. Gomez testified at every stage he didn't have a weapon. I didn't see that he had a weapon. [¶] So we know that self-defense and defense of others is out. There was no lethal force that was used by Mr. Mora; we know that."

"You know, if the person has a gun, has a knife and is going for someone, then it would be reasonable. [¶] In this case we know that Mr. Mora had no weapon. So for Mr. Machuca to then take out a gun and blast him three times is not reasonable. So self-defense doesn't apply. That doesn't apply."

". . . I think what they were trying to insinuate was that, you know, 'isn't it likely that Mr. Mora had a gun?' I think that's what they were trying to get at. You know, that maybe they thought he would have a gun. [¶] Okay. Sure, let's concede that. [¶] But members of the jury, he didn't have a gun and they knew he didn't have a gun. [¶] But the point is, yes gang members carry guns. So when you get into a gang fight, is murder . . . a foreseeable consequence? Absolutely."

Appellants contend that these statements were "misleading" because California law does not condition self-defense on Mora having a weapon or employing lethal force or on appellants' fear of Mora. Not so. The law of self-defense in California requires a showing that: (1) the defendant reasonably believed he or someone else was in imminent danger of suffering bodily injury; (2) the defendant reasonably believed the immediate

28

use of force was necessary to defend against that danger; and (3) the defendant used no more force than was reasonably necessary to defend against that danger.  (CALCRIM No. 3470.)

The prosecutor's comments regarding whether Mora had a gun or used lethal force obviously relate to the third element of self-defense—whether Machuca was justified in using lethal force against Mora.  In addition, the prosecutor's comments regarding whether appellants feared Mora related to the reasonableness of their belief of imminent bodily harm.  None of these comments, taken in context, mislead the jury about what is involved in the theory of self-defense.  "It is not misconduct for a prosecutor to argue different inferences from the evidence."  (*People v. Pineiro* (1982) 129 Cal.App.3d 915, 923.)  It is unlikely the jury misconstrued the prosecutor's words in the manner suggested by appellants.  (*People v. Ayala* (2000) 23 Cal.4th 225, 284.)  It is clear the prosecutor urged the jury to reject the self-defense theory and instead adopt her theory that it was a crime of opportunity for two gang members to take down a rival in their territory.  Importantly, the jury was repeatedly informed, by the court and both counsel, that instructions on the law would be given by the court alone.

Appellants also contend the prosecutor misstated the evidence.  In particular, Machuca argues, "Throughout the argument, the prosecutor twisted the facts in an attempt to deceive the jury.  She would make a statement, tell the jury the basis of her statement was not required by the law, then argue that the statement nonetheless established appellant's intent.  For example, the prosecutor complained that appellant could have told Gomez to drive away, he didn't have to, but his failure to do so established his intent to kill.  Or, the prosecutor argued appellant could have pulled his gun and told Mora to back off, we don't want any trouble, he didn't have to, but because he didn't that tells you he intended to kill."  This is not improper argument.  This is merely a case where the prosecutor was presenting her view of the evidence and the inferences to be drawn from it.  (*People v. Pineiro, supra,* 129 Cal.App.3d at p. 924.)  Indeed, intent is often shown through circumstantial evidence.  (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

29

Appellants also contend the prosecutor argued facts not in evidence during her closing:

"So you can like him [J.C.] or dislike him; that's not important. What you have to do is judge the credibility of the evidence that he provided. And it is undisputed that it was true."

"[Gomez] has never been convicted of any felonies."

"There is also no evidence that Mr. Mora attacked anybody. And that is important because both defense attorneys have said, you know, he is running up and attacking Miss Ayon. But there is no evidence that he attacked her or that he physically harmed her in any way."

The statement about J.C.'s credibility is entirely appropriate argument. The statement that Gomez was never convicted of any felonies clearly referred to the time before he plead in this case; indeed, the prosecutor acknowledged he plead to a charge stemming from this case. The statement about Mora clarified that even though he came up to the window and put his hand in the car near Ayon, he did not actually touch her or harm her. There simply was no prosecutorial misconduct committed by making these statements. But, even if these statements were erroneous, they do not " 'comprise[] a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819, 823-829 [prosecutor not only misstated the evidence, she referred to facts not in evidence, cast aspersions on defense counsel and misstated the law]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1108.) The jury heard many days of testimony about J.C.'s potential bias, Gomez's plea bargain and Mora's contact with Ayon. Moreover, the trial court advised the jury that "nothing that the attorneys say is evidence." The prosecutor's fleeting comments during closing are insufficient to render the trial fundamentally unfair.

Finally, appellants contend the prosecutor played to the passions and prejudices of the jury by referring to Mora as homeless, a drug addict, or as a human being who may have had a mother, father, brother, or wife. Appellants also take issue with the prosecutor painting the picture of "brains [] on that crime scene" and 'a lot of that blood

was very clumpy." According to Machuca, these incredibly inflammatory comments were irrelevant and made solely to appeal to the sympathies of the jury.

It was not misconduct for the prosecutor to describe Mora or the crime scene from the evidence admitted at trial. Mora had methamphetamine in his system, was acting erratically, and was far from the Drifters gang territory. Moreover, Mora was shot in the face and Machuca described to J.C. how "brain splatter" was on the van. The comment that Mora may have had parents, a sibling, or a spouse was made to show the police would have taken Mora's murder seriously when interviewing Luna. Taken in context, it was not an attempt to curry sympathy from the jury for the victim.

### C. Argument on Tattoos

Ayon contends the prosecutor used evidence of her tattoos to argue to the jury that she was predisposed to crime and was the type of person who was likely to have committed the charged crimes. Essentially, Ayon claims the prosecutor argued she should be convicted based on her status as a gang member. In particular, Ayon takes issue with the following statements made to the jury:

"Was Miss Ayon just the front seat passenger who didn't do anything? No. It may seem like that at first glance, and you see Miss Ayon sitting her in court, you know, every day with her cardigan and her—you know, you don't see any of her tattoos. [¶] This is not Miss Ayon you see in court. This is not the real miss. Ayon. The real Miss Ayon is who she is, and what she does when she doesn't feel like anyone—or she doesn't feel that she can get in trouble for it."

"It is clear that Miss Ayon is guilty, under that [natural and probable consequences] theory, because if she—with what we have, all the evidence that we have against her, okay, conflicting or not conflicting, is that we know that at the very least she is saying "18th Street, 18th Street." She is engaging in that confrontation. She is a hardcore gangster. She doesn't look like that in court right now, but she is because you have seen her tattoos."

31

"And I don't bring in these photographs, you know, just to—just for fun. It is not gratuitous. It is because it tells you who they are in terms of how—what they believe. What's important to them. What are they trying to say by their tattoos."

"On the back of her neck she has 'What Bitch.' She has the 'B' crossed out. But not only that; I mean, why does she say that? I mean, this is a very aggressive statement, right? Is this the person who is afraid, who isn't up for a challenge, who isn't ready to have a confrontation and be down for her gang? She has 'Bitch' tattooed all over her. We know on her stomach, '118 percent Bitch.' Not just '100' percent Bitch; it is more. [¶] Again, this shows you her state of mind, what her intent is, how she identifies herself, what she knows, not only of herself, but also of the situation that she is getting herself into."

"And Miss Ayon has, again, a lot of tattoos, but she has 'Barrio 18th Street' on her hand, on the top of her right hand where everyone can see. I mean, she is not hiding her affiliation; she is not hiding where—or where her loyalty is. [¶] 'Dieciocho' her arm. She has this tattoo of 18th Street on her torso that covers her torso, okay, all the way across her torso. [¶] This is not someone who associates with 18th Street. She is down for the gang. She knows exactly what is going on when she says, 'Where are you from?' or when she responds '18' to a rival gang member. [¶] And again on her back, in old English roman numbers, 'Eighteen, play at your own risk.' Play at your own risk. What does that mean? It means, you know what? Play at your own risk. I am dangerous. Okay? It is up to you, if you are ready to take me on. [¶] And finally on her arm, 'Fuck my enemies.' Why does she have this tattoo on her? 'Fuck my enemies.' That tells you exactly what she thinks about her rivals. That tells you exactly what she is ready to do for 18th Street because the little devil even has the 'E' for 18th Street. [¶] Fuck my enemies. [¶] Okay? She has this tattoo. She has all of these tattoos."

"And then just one more thing about the tattoos, because [defense counsel] is making a big deal about –he had one of the slides with lie a tornado, you know, that something—she doesn't have control over certain things. She wasn't driving; she wasn't the shooter; she has no control. [¶] But she has control over what she puts on her body. She has control over what tattoos and how she chooses to brand herself and emblaze herself with certain tattoos. She has complete control over that. And I am not going to go over it again, but you know what she has chosen to have emblazoned on her body."

Ayon has misinterpreted the prosecutor's statements. When taken in context, the challenged statements show that the prosecutor argued that her numerous tattoos were relevant to show her level of commitment to the 18th Street gang and to her state of mind at the time she initiated the gang challenge to Mora. They were also pointed out in order to prove the truth of the gang allegations. The prosecutor's arguments regarding the tattoos were fair comments on the evidence.

Ayon relies on three cases, *People v. Duvernay* (1941) 43 Cal.App.2d 823, 828, *People v. Garcia* (1984) 160 Cal.App.3d 82, 93 and *People v. Bross* (1966) 240 Cal.App.2d 157, 171. They are each distinguishable. In *Duvernay* and *Bross*, the courts held that the prosecutor made statements in closing that were "most prejudicial and held that "[c]ounsel may not, under the guise of argument, assert as facts matters not in evidence." (*Bross, supra*, 240 Cal.App.2d at p. 173 [prosecutor quoted defendant as saying that she was going to kill the victim; defendant did not so testify]; *Duvernay*, *supra*, 43 Cal.App.2d at p. 827 [prosecutor accused defendant of being drug addict in closing].) In *Garcia*, the court held the prosecutor may not use defendant's inappropriate courtroom behavior to establish that he was the type of person willing to participate in unlawful activity. (*Garcia, supra*, 160 Cal.App.3d at pp. 93-95.) While referring to facts not in evidence may be misconduct, that is not what happened here. Unlike in *Bross* and *Duvernay,* the tattoos were in evidence and the prosecutor properly used them to demonstrate Ayon's state of mind and affiliation with the 18th Street gang. There was no

33

ineffective assistance of counsel in failing to object to the prosecutor's statements regarding Ayon's tattoos.

## V. Custody Credits

The parties agree the trial court miscalculated appellants' pretrial custody credit by one day; they should have received 667 days rather than 666. The abstracts of judgment reflect no credit for time served for either Ayon or Machuca. The abstracts of judgment should be corrected to accurately reflect 667 days of actual custody credit.

## DISPOSITION

The abstract of judgment for both appellants should be corrected to reflect 667 days of credit for actual time served. The judgments are otherwise affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

FLIER, J.